MILLER RUBBER CO. et al. v. CITIZENS' TRUST & SAVINGS BANK.

In re NEWERF'S ESTATE.

(Circuit Court of Appeals, Ninth Circuit. May 1, 1916. Rehearing Denied June 2, 1916.)

No. 2737.

1. BANKRUPTCY ⚮140(3)—RECLAMATION OF PROPERTY—CONSIGNMENT OR SALE.

By a contract claimant made bankrupt its exclusive agent for the sale of its goods within a certain territory, and agreed to keep him supplied with a stock which should remain claimant's property until sold to bona fide customers in the usual course of business. The contract did not fix, nor reserve the right to fix, prices at which the goods were to be sold nor require bankrupt to account for the proceeds, but required him to report those on hand each month, and pay for those sold at a stated discount from list price, with provision for a credit of four months, if desired, up to a certain amount. Bankrupt was permitted to mingle the goods with his other stock, and the contract required claimant to furnish him free of charge with advertising matter imprinted with his business name. *Held*, that while, as between the parties, the contract was one of consignment, as to creditors of the bankrupt title to the goods passed to him, and they could not be reclaimed from his trustee.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 225; Dec. Dig. ⚮140(3).]

2. PRINCIPAL AND AGENT ⚮82—CONTRACT OF AGENCY—COMMISSIONS.

A contract under which goods were furnished to an agent for sale construed, and *held* that the commissions were based on the sum named in the price list, less 5 per cent. discount for cash.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 216–219; Dec. Dig. ⚮82.]

Appeal from the District Court of the United States for the Southern Division of the Southern District of California; Robert S. Bean, Judge.

In the matter of the estate of W. D. Newerf, doing business as the W. D. Newerf Rubber Company, bankrupt; the Citizens' Trust & Savings Bank, trustee. From an order, made on the petition of the Miller Rubber Company and the Miller Rubber Company of California to reclaim property, both petitioners and the trustee appeal. Affirmed.

W. Scott Bicksler, W. C. Smith, and Dale H. Parke, all of Los Angeles, Cal., for appellants.

W. T. Craig, Dave F. Smith, and Norman A. Bailie, all of Los Angeles, Cal., for appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge. This case presents cross-appeals from the judgment of the District Court, in part confirming and in part rejecting the recommendations made to it by the special master in pursuance of his findings of fact and conclusions of law.

The appeal of the two rubber companies presents the question of the title to certain goods delivered to the bankrupt by the Miller Rub-

ber Company, a corporation of the state of Ohio, under and in pursuance of a contract dated November 6, 1911, entered into between that company and the bankrupt, Newerf, then doing business as W. D. Newerf Rubber Company; and the appeal of the trustee in bankruptcy involves the question as to the compensation the bankrupt was entitled to under a contract entered into between the Miller Rubber Company, a corporation of California, and the bankrupt, Newerf, of date June 11, 1914, to take effect July 1, 1914, and a supplemental contract between the two last mentioned parties. For the proper disposition of the appeals, it is therefore necessary to state the substance of the three contracts.

[1] It will be in order to take up first the appeal of the rubber companies, involving the contract of November 6, 1911, to which contract the Prudential Rubber Company, also an Ohio corporation, was a party of the first part with the Miller Rubber Company of Ohio, and to which W. D. Newerf Rubber Company, of Los Angeles and San Francisco, Cal., was the party of the second part. By its terms the party of the second part was made the sole agent of the parties of the first part "in making sale of first parties' automobile tires and tubes in the states of California, Oregon, Washington, Idaho, Nevada, Arizona, and British Columbia, and Hawaiian Islands"; the party of the second part agreeing to maintain at its own expense an office and showroom at a convenient location in the cities of Los Angeles and San Francisco. The parties of the first part agreed to furnish the party of the second part "on consignment a stock of above goods manufactured by the first parties, for the purpose of supplying customers and prospective customers in the territory mentioned, the quantity of such stock to be at all times limited to a reasonable amount"; the party of the second part expressly agreeing "that all goods or stocks of goods so furnished by the first parties shall at all times be and remain the property of the first parties until sold and delivered to bona fide customers in the usual manner." The party of the second part agreed to furnish the parties of the first part each month a complete inventory of all goods in its hands belonging to the parties of the first part, or at their option to permit them to have their representative take an inventory of such stock. The contract provided that the party of the second part should make monthly settlements "for all purchases from and all shortage in stock of first parties"—remittances to be mailed to the parties of the first part on the 10th of each month for previous month's sales. It provided that, when desired by the party of the second part, "four months notes drawing interest at 5 per cent. will be accepted by first parties in settlement for all purchases made by second party from first parties: Provided, however, that the total maximum of such notes shall not exceed twenty-five thousand dollars ($25,000.00) at any one time during the first year of this contract, and that such maximum after the first year is to be subject to the mutual agreement of both parties, but not less than twenty-five thousand dollars ($25,000.00), unless credit of second party becomes impaired." It provided that all goods should be delivered by the parties of the first part f. o. b. Los Angeles or San Francisco, Cal., or Seattle, Wash.;

that upon the expiration or termination of the agreement, or any renewal thereof, or upon its abrogation as therein provided, the party of the second part should "surrender and turn over to the first parties all the property belonging to the first parties, of whatsoever nature, and will make full and complete settlement and accounting to the first parties of all property that may have been intrusted to second party's custody by virtue of this agreement."

After fixing a schedule of prices and discounts therefrom, and providing that for any reduction in prices by the parties of the first part during the life of the contract the party of the second part shall be entitled to a credit for the amount of such reduction on all stock on hand at the time such reduction goes into effect, and providing that the parties of the first part will also give to the party of the second part the lowest prices that they give to any one for goods in any quantity, except for demonstrating or advertising purposes, the contract further provided that when shipments are made from Akron, Ohio, by the parties of the first part to the party of the second part in the territory covered by the contract, the parties of the first part would render a credit memorandum of the difference between the net amount realized for such sales and the net value of such goods charged at prices made to the party of the second part by the parties of the first part, and further provided that all "replacements only on Miller tires and tubes are to be wholly under the control of the first parties, but it is agreed that all replacements shall be made by second party, and that a compensation of 10 per cent. of amount received be paid by first parties to second party for handling such replacements. All replacements to be made from consigned stock of first parties and to be reported in writing by second party to first parties: Provided, however, that first parties are to have the option of putting in their own adjuster, if at any time the adjustments made by second party are not satisfactory to first parties." The contract further provided that the parties of the first part should pay to the party of the second part the actual cost of repair work done on all the Miller tires and tubes, invoices to be rendered at the time to the parties of the first part of such repairs. It further provided that the parties of the first part would furnish the party of the second part free of charge all samples of tires and accessories and necessary advertising matter, imprinted with the name and address of the second party, and to allow one-half of the expense of Newerf or his manager to the factory at Akron, Ohio, at least once a year during the life of the contract, which, together with its termination, was also specified.

Evidence was introduced on behalf of the respective parties before the special master, who made certain findings of fact, among which was one to the effect that the contract of November 6, 1911, continued in force as to the goods shipped by the Miller Rubber Company of Ohio to the bankrupt prior to the making of the subsequent contract of July 1, 1914, $7,685.23 worth of which goods remained in the possession of the bankrupt at the time of his adjudication in bankruptcy, and which goods were, during the time the bankrupt was engaged in the business, commingled with other goods in his possession, but sub-

sequent to the adjudication in bankruptcy were segregated and are held by the trustee subject to the present suit for their reclamation. The conclusion of the special master, in view of the facts stated, was that the title to the goods held by the bankrupt under the contract of November 6, 1911, was in the bankrupt, and that the goods therefore were not subject to reclamation by the Rubber Company, which conclusion was sustained by the court below. And that is the question for decision upon the appeal of the Miller Rubber Companies.

As between the parties to this contract, we are unable to make anything more of it than what it purported to be, namely, a mere consignment of the goods to the W. D. Newerf Rubber Company, for sale upon the terms and conditions therein stated. Its first provision expressly declares the party of the second part thereto the agent of the parties of the first part and its agreement to act in that capacity in making sales of the consigned property. It subsequently expressly declares that all the goods so consigned shall at all times be and remain the property of the parties of the first part until sold and delivered by the agent to its bona fide customers in the usual manner, monthly settlements of which are required to be made by the agent, as well as for any shortage in the consigned stock, and that upon the expiration or other termination of the contract the agent should surrender and turn over to the parties of the first part all of the remaining consigned property, and make "full and complete settlement and accounting to the first parties for all property that may have been entrusted to second party's custody by virtue of this agreement." As said by this court in General Electric Company v. Brower, 221 Fed. 597, 602, 137 C. C. A. 321, 326:

"To constitute a sale, there must have been in the contract a vendor and a vendee, and a provision for a transfer of property by the vendor to the vendee, and an obligation by the vendee to pay an agreed price therefor, *or the circumstances outside of the contract must have been such as to show that it was the intention of the parties to make of the contract a fraudulent concealment of an actual sale.*" (Italics ours.)

The same thing was in effect held by the Supreme Court in the case of Ludvigh v. Am. Woolen Co., 231 U. S. 522, 528, 34 Sup. Ct. 161, 58 L. Ed. 345. There were in neither of those cases such fraudulent circumstances; but we do not think that that can be affirmed of the present case, for here, not only was the agent permitted to mingle the consigned goods with his own stock, but the contract expressly provided that the consignors would furnish the consignee "free of charge all samples of tires and accessories and necessary advertising matter, imprinted with the name and address of the" consignee. It is difficult to see how the consignors could have more effectually held the consignee out to its customers as the real owner of the consigned property. To permit them to retake from the stock of the bankrupt the remaining portion of the consigned goods would, in our opinion, operate as a fraud on the creditors of the bankrupt.

We find confirmation of this view in the failure of the consignors to fix by the contract the prices at which the agent could sell the goods to its customers, and in their failure to therein make any provision for

the remitting to the consignors of the proceeds received by it for the goods so sold; the agent being required by the contract to itself pay to the consignors for the goods so sold by it prices fixed in the invoice, less the deductions specified, and in the provision that, when the agent desired, "four months notes drawing interest at 5 per cent. will be accepted by first parties in settlement for all purchases made by second party from first parties; Provided, however, that the total maximum of such notes shall not exceed twenty-five thousand dollars ($25,000) at any one time during the first year of this contract, and that such maximum after the first year is to be subject to the mutual agreement of both parties, but not less than twenty-five thousand dollars ($25,000), unless credit of second party becomes impaired." For the reasons stated, we think the court below was right in confirming the conclusion of the special master that, as to the creditors of the bankrupt, the title to the consigned goods in question should be held to have passed to the consignee.

[2] In respect to the commissions to which the bankrupt is entitled under the contracts of 1914, involved in the cross-appeal of the trustee, we must turn to those contracts, first observing that it appears from the findings of the special master that the Miller Rubber Company of California was organized under the laws of that state for the purpose of acting as agent in handling and selling the goods of the Miller Rubber Company of Ohio, and to enable the latter company to have a representative in California, "thereby saving the Miller Rubber Company of Ohio from filing a certificate and paying license fees and being licensed to do business in the state of California," and "to protect the name of the Miller Rubber Company in California, and to prevent, so far as possible, trade competition therewith." The contract dated June 11, 1914, expressly declares that it "shall take effect on the 1st day of July, 1914, and expires on the 1st day of July, 1919, unless sooner terminated," and was made between the Miller Rubber Company of California as party of the first part and W. D. Newerf as party of the second part. Among the recitals contained in the contract last mentioned are the following:

"Whereas, it is the desire of the party of the first part to employ party of the second part as its agent within and for the following territory, viz.: The states of California, Oregon, Idaho, Washington, Nevada, and Arizona, and in addition thereto British Columbia and the Hawaiian Islands: Provided, however, that this provision shall be null and void as to any portion of the aforementioned territory, providing the sales made by the party of the second part do not, in the opinion of the party of the first part, warrant the continuance of any portion of said territory, it being understood and agreed that sixty (60) days' written notice by the first party to said second party of said first party's dissatisfaction with the sales made by the second party in any portion of said territory shall be sufficient to eliminate any portion of the aforementioned territory from this contract; and it is furthermore mutually agreed that such agency is and shall be restricted to such matters as are in this agreement, and supplement thereof, set forth, the headquarters and office of the said agent to be at the cities of Los Angeles and San Francisco, Cal., under and pursuant to the terms and conditions incidental thereto, which party of the second part hereby accepts and agrees to perform."

After that preamble the agreement declares that the party of the second part shall enter into the employment of the party of the first

part within the territory specified for the term of five years; that that agency shall cover only automobile casings and tubes manufactured by the Miller Rubber Company of Akron, Ohio, unless in express terms otherwise agreed; that the main office of the agency shall be Los Angeles, Cal.; that the party of the first part will place in stock in that city and in San Francisco a general and assorted stock of automobile casings and tubes manufactured by the Miller Rubber Company of Akron, Ohio, and other products of the same manufacture, if mutually agreed upon, and keep and maintain such stock equal to the net value of not less than $20,000, nor more than $60,000, according to the demand of the trade—the party of the second part agreeing to provide a suitable place to store the goods and to protect them from all damage except such as may arise from deterioration from lapse of time.

Omitting immaterial matter, the agreement further provides that the party of the second part "shall make sales from the said stock of casings and tubes to responsible purchasers and at prices not lower than 10, 12½ trade discount, and 5 per cent. additional for cash, from the 1914 price list of the Miller Rubber Company of Akron, Ohio, a copy of which is hereto attached and marked Exhibit A and made a part hereof, and dated as effective December 1, 1913, subject to changes in said list and discounts as hereinafter set forth (and sales of other products at such prices as may be agreed upon from time to time), and make collections upon all sales and deposit the funds from said sales in such depositary in Los Angeles and San Francisco, as the party of the first part may select, such funds to be deposited in the name of and to the credit of the Miller Rubber Company of California, subject to the check of the treasurer, or the duly authorized officer of the Miller Rubber Company of California, and said second party shall make a statement of said bank account to the party of the first part on the 1st day of each and every month commencing August 1, 1914"—all sales from such consigned stock to be made in the name of the Miller Rubber Company of California, on terms not to exceed 30 days net, except as may otherwise be mutually agreed upon in writing by the parties, and except as otherwise provided in the contract, which further provided that the party of the second part should receive—

"in full payment for his services as such agent, and in full payment of all salaries, rent, clerk hire, and other expenses incurred by him, the difference between the price, or prices, at which goods are actually sold by said party of the second part, and the price of 10—12½—12½—5 per cent. from the Miller Rubber Company's 1914 price list effective December 1, 1913, a copy of which is hereto attached and marked Exhibit A and made a part hereof, which prices and list are subject to change as hereinafter provided; it being understood that the party of the second part shall assume and pay all collection expense, and assume all losses for bad accounts, and said second party shall execute and deliver to first party a bond or security of equal protection to first party, and to the approval of first party, in the sum of twenty thousand dollars ($20,000), guaranteeing the payment to it of all accounts for goods sold by second party, the liability on said bond or other security to become fixed, at the option of first party as to each account, on failure to pay the same within 60 days after maturity, and the surety on said bond shall waive all notice of default in the payment of any account, and shall

consent to any extension of time of payment thereof, and said bond shall further be conditioned to secure the safe-keeping and redelivery to first party of all stock so placed in the hands of second party, as hereinafter provided."

This contract, of date June 11, 1914, contained various other provisions not important to the point under consideration, and also a further provision reserving to the party of the first part "the right to change at its option all price lists and discounts aforementioned, but it agrees to advise the party of the second part immediately when any changes are made: Provided, however, that the net difference between the Miller Rubber Company's prevailing special dealer's price and the price on which second party's compensation is figured shall be not less than 10 per cent." It declares that upon its termination for any reason, "and unless in express terms renewed, party of the second part agrees to deliver to the order of the party of the first part, or to return to Akron, Ohio, free of all charges, all consigned stock not paid for," with conditions unimportant here. It provides for its cancellation in a certain prescribed way, and concludes with this clause:

"This contract and supplement shall supersede all contracts, agreements, or understandings of any nature now existent between the Miller Rubber Company, or the Miller Rubber Company of California, and W. D. Newerf Rubber Company, or W. D. Newerf, and such contracts, agreements, and understandings shall be and are considered null and void, except as to the unpaid accounts."

The supplementary agreement, of date June 11, 1914, between the Miller Rubber Company of California and Newerf, recites the employment of the latter by the Miller·Rubber Company of California as its selling agent in the territory and under the conditions specified in the preceding contract of the same date, and the desirability "that the same arrangement, with certain exceptions, shall be made and applied to the handling of automobile repair materials and automobile tire accessories," and then declares that the respective parties mutually agree:

"First. That automobile tire repair materials and automobile tire accessories shall be handled in the same manner as is contemplated with regard to casings and tubes in said contract of June 11, 1914, and that all of said contract, except as to the basis on which sales shall be made, shall apply to automobile tire repair materials and automobile tire accessories, the same as if said repair materials and accessories had been originally included in said contract.

"Second. That the compensation to said second party for the fulfillment of that part of this contract shall be the difference between the prices at which sales are actually made to their customers and the prices on attached sheet marked Exhibit C. Party of the first part reserves the right to change their list prices and discounts at any time, and agrees to notify said party of the second part immediately of such action.

"Third. That the party of the second part shall have the right under this contract to make sales of automobile tires, repair materials, and tire accessories in the territory specified in the original contract, such right to be exclusive as to territory, except as hereinafter provided. However, party of the second part agrees to handle the aforementioned materials and accessories to the exclusion of all competitive goods: Provided, further, however, that the party of the first part reserves the right to sell any and all concerns located in the territory granted as exclusive in the original contract, and to which this is a supplement, if the party of the second part is for any reason unable

*to do so; but first party agrees to pay to the party of the second part the difference in price or prices between the actual sales price to the customer and the prices at which the materials sold would have been charged to the said second party, and be it provided, further, that the party of the first part shall reserve the right to make sales of fabrics and other materials under this supplement direct to manufacturers of reliners and blow-out patches, and that no commission shall accrue to second party for sales of fabrics and other materials sold to manufacturers of reliners and blow-out patches, unless such sales are actually made by the second party, and at an advance over the minimum price or prices listed on the attached Exhibit C.*

*"Fourth. Furthermore, this supplement may be canceled at any time by either party on ninety (90) days' written notice, one to the other."*

As will be seen from the foregoing, the agent's commission is declared to be the difference between the price at which the goods are *actually sold,* and 10—12½—12½—5 per cent. from the price list. There is here a clear distinction made between the prices specified in the list or invoice of the goods and the price at which they were actually sold by the agent. To purchasers who availed themselves of the 5 per cent. allowed for cash it cannot, in our opinion, be properly said that the goods were actually sold for the prices specified in the lists, and therefore we agree with the court below that in such cases the percentage to which the bankrupt was entitled must be based on the sum named in the price list, less the 5 per cent. deducted for cash.

The judgment is affirmed.