### In re WEISL et al.

### PETITION OF SEACOAST CANNING CO.

(District Court, S. D. New York. June 11, 1924.)

1. **Bankruptcy ⟨key⟩212—Goods held to have been received by bankrupt on commission, and not as buyer.**

   Shipments of canned fish from petitioner to bankrupts *held*, on the evidence, to have been for sale on commission, and not on sale orders which vested title in bankrupt.

2. **Bankruptcy ⟨key⟩140(3)—Right of principal to reclaim goods on bankruptcy of factor; estoppel.**

   The owner of goods consigned to a factor for sale is not estopped to reclaim those unsold on the bankruptcy of the factor, unless he has aided the factor in falsely representing the goods as his own.

3. **Bankruptcy ⟨key⟩140(3)—Right of principal to reclaim goods on bankruptcy of factor; estoppel.**

   That a principal, which had consigned goods to a factor for sale, had knowledge that the factor represented to banks from which it borrowed money for its own benefit that it was the owner of the accounts receivable for consigned goods sold, imposed no duty upon it to undeceive the banks, where it had no interest in the transactions, and received no benefit from them, nor was it estopped to reclaim goods in possession of the factor at the time of its bankruptcy, as to which no misrepresentations were made.

In Bankruptcy. In the matter of Carl Weisl, Hayden Dudley, and William D. Breaker, individually and as partners doing business as U. H. Dudley & Co., bankrupts. On petition of the Seacoast Canning Company for reclamation of 45,161 cases of canned fish. Petition granted.

This proceeding arises somewhat irregularly upon the report of a referee in bankruptcy. The parties have not excepted to the referee's report or noticed the exceptions for a hearing. Instead, the party aggrieved has moved that the report be "not confirmed," but "rejected,"

---

⟨key⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and that the petitioners have their relief. The trustee took no objection to this practice. The proceeding is on reclamation of certain cases of sardines and tuna fish, which came into the possession of the receivers, now trustees, and to which the petitioner claims title on the theory that the bankrupts were commission agents to whom the goods were shipped for sale. The trustees claim title to a part of the fish on the ground that the petitioner sold them to the bankrupts, and to all of them because the petitioner had allowed the bankrupts to hold them out to their creditors as owned by them, and the creditors had lent money on the faith of that representation. In the following opinion, the petitioner, Seacoast Canning Company, is referred to as Seacoast, and the bankrupts, U. H. Dudley & Co., as Dudley.

Paul Kieffer, John Quinn, and Sherman Woodward, all of New York City, for Seacoast Canning Co.

Spotswood D. Bowers and Burt D. Whedon, both of New York City, for trustees.

LEARNED HAND, District Judge (after stating the facts as above). The first point concerns the character of the transactions; the second, the putative estoppel. The trustees do not claim except by estoppel any goods shipped on consignment, nor the petitioner any goods sent direct to customers, which in the nature of things would not come to the trustees' possession. This leaves only shipments sent on those of Dudley's orders which contained prices. All fish shipped on orders to Eastport containing prices were shipped direct to customers and are out of the suit. It follows that the only fish in controversy are those shipped to Dudley on orders to California which contained prices. The first question is whether these fish were sold to Dudley, or sent to them on consignment, as concededly were those which came upon orders which contained the word "consignment."

Until the end of the year 1918 there can be no question that, so far as the records show, Seacoast sold no goods to Dudley. It was only in the year 1919 that any goods were shipped to them directly at all. Up to that time it had been the uniform practice for Dudley to close contracts with customers, to advise Seacoast of the quantities and prices, for Seacoast to fill the orders by direct shipments to the customers, and to invoice or bill the goods to Dudley, who would at their option either pay at once, or after the customers had paid them. Since Dudley guaranteed the accounts and got a commission of 5 per cent., together with their expenses, no element was lacking to create the relation of del credere factor, though the parties did not use, and perhaps did not know, that phrase. The discount of $1\frac{1}{2}$ per cent. for payment within 10 days was consistent with such a relation because of Dudley's guaranty. It made no difference whether Dudley paid at once the discounted price and recouped the full price later, or waited till the customer paid and then themselves paid the full price. The trustees do not claim that these transactions were sales.

[1] In 1918 the California plant was set up, and for trade reasons it was thought best to do the selling in a somewhat different way. In 1919, Whitmarsh, who was then the president of Seacoast, told Break-

er, the controlling member of Dudley, that he wished to consign ship-
ments to the firm at various places, from which they might be sold as
occasion offered through the firm's efforts. Breaker agreed, and there-
after, and indeed down to the time of the bankruptcy, many such ship-
ments were made, both from California and Eastport. Some of these
are among the goods in suit, and as to them the trustees raise no ques-
tion except that of estoppel. They were as little sales to Dudley as the
"direct" sales to customers, though Seacoast billed the California con-
signments exactly as though they were sales. The only difference was
that Dudley did not pay for these goods until they had sold them at
prices which might be different from those in the invoices.

If nothing more had happened the trustees' first claim of title would
not exist, but some time in December, 1922, another practice came into
vogue, the significance of which I must determine. Beginning on De-
cember 23, 1922 (Exhibit 93), there are a series of orders from Dud-
ley for California goods at fixed prices. These were filled by ship-
ments to Dudley, and part of them remained on hand when the receiv-
ers were appointed. The trustees say that these were sales; the peti-
tioner, that they, too, were consignments. The trustees rely upon the
form of the orders; the petitioner, upon the testimony of the officers
of Dudley and upon the invoices and books. Gibson, of Dudley, said
that about January 1, 1923, Nicholas, of Seacoast, asked him to put
prices in the California orders to be shipped on consignment, because
they depleted Seacoast's inventory and the company wanted something
near the market price to show in their place. In fact, with some ex-
ceptions which I shall consider, there were, after December 23, 1922,
no shipments to Dudley from California on orders which do not con-
tain prices, and there had been none before that time which contained
prices. The practice, therefore, in general bears out Gibson's testi-
mony.

The exceptions are five orders after December 23, 1922 (Exhibits
102, 124, 126, 127 and 128), which contain neither the price, nor the
word "consignment," and two (Exhibits 125 and 129) which contain
"consignment" and nothing more. Nobody tries to explain these or-
ders, and I do not know why they were so made out. Concededly Ex-
hibits 125 and 129 were not sales; they are important only as evidence
to argue that the "price orders" were. I agree that, occurring as they
do in the period in question, they show that the practice was not uni-
form, and they must be accounted for on the theory of an occasional
relapse into the earlier ways. But it is not surprising that there should
have been two such lapses among so many. After all, the addition of
the prices was not very important under Gibson's version. The five
which had neither price nor consignment upon them are in any aspect
incomplete, as much so as sales they are as consignments. The trus-
tees argue that they should win as to these under the burden of proof.
but I think not. If they were not consignments they were egregious
exceptions in a course of trade extending over many years and cover-
ing hundreds of parcels. The probabilities seem to me enormously in
favor of their being what all the rest were.

Exhibit 89 is even more baffling, and I do not profess to explain it
any more than Gibson could. It was an order for five kinds of fish,

and a price is set opposite all five items of the order. Opposite the fifth stands, in addition, the word "consignment." The fifth item is for 600 cases of tuna fish, but divided into two parts, 300 and 300. Below is written, "Please add this 300 cases of Tuna if pos." If the entries, "$9.50" and "consignment" are read distributively against the two items of 300 and 300, it may be argued that one was a sale and the other a consignment. That is not, however, very likely. The shipment of one of the items was clearly in doubt as appears by the legend quoted. Perhaps the writer was not sure when the second item might be shipped, and therefore what the market price would be, if it ever was. He had, therefore, nothing to do but put it in as a consignment. This is, of course, entirely speculative, but then so is any other interpretation of the order, Breaker's letter of February 24, 1923, being absent. It would in my judgment be absurd to hold that, because of the possibility that there was a difference in intent between the single item and all the rest, that possibility should color all the transactions. I can therefore leave this document merely with the statement that it is too ambiguous to help either side.

Except for the form of the California orders, the trustees have no evidence at all to support their case that I can find. It was extremely unlikely that so radical a change in the relations of the parties would have been made without some notice of it in the numerous documents. Nor can I conceive a reason why Seacoast should at the same time continue to consign goods from Eastport and to sell them from California. In 1923 nearly 4,500 cases were sent from Eastport on consignment. The number sent on "price orders" from California was, it is true, immensely more numerous than that, but that scarcely accounts for treating them differently. There is not a shadow of reason suggested in the whole confused record for supposing that Seacoast should wish to treat Dudley as a buyer. I cannot see why Breaker should have personally wanted to do so. Apparently his indebtedness was becoming more than he could bear without this. There is no proof that he thought the market was rising.

Coming, then, to the petitioner's documentary proof, I attach more weight to the accounts, though rendered on the eve of bankruptcy or afterwards, than the trustees will agree to do. It is true that they have much less importance than if they had not been so long delayed, but some were drawn up by the accountants on May 31, 1923, while business was going on. At least they show how these outside men interpreted the books, and they are in addition good admissions against the trustees, since they were rendered by them as receivers.

Again, the trustees seem to me to fail to recognize the full force of the stock books. In these the contested shipments were entered precisely as consignments had been entered before December, 1922; i. e., for the account of Seacoast. I may admit with the trustees that the firm would have entered the shipments somewhere in its books, and that it might have mingled them all in one book; but I confess it seems to me curious that sales and consignments should be entered indiscriminately for the account of the company, when on no possible theory was that proper for the sales.

Finally, the form of these invoices forbids the inference that the transactions were sales. On what conceivable theory should the seller allow the buyer, not only a discount for quick payment, which was natural enough, but a commission of 5 per cent. for brokerage? There are, indeed, many curious ways of allowing concessions to a buyer, due to the seller's unwillingness to admit that he really breaks the price; but I venture to believe that a discount expressly for brokerage is not among them. At any rate, while such a way of billing goods might be explicable, it certainly needs much explaining, and there is in the record no explanation that I can find. The Eastport invoices all bore the word "consignment." It might be argued that the California invoices, which left them out, were therefore sales; but the difficulty is that, if so, it would equally affect all consignments before January 1, 1923, none of which in fact were sales. When, therefore, California kept sending precisely similar invoices as before, bearing, as before, the brokerage commission, there is every reason to believe that the purpose continued as it had been.

I find, therefore, that in the cases under dispute the transactions were not sales, but consignments to Dudley as del credere factors. So considered, it is plain that the agreement was entirely legal as to Dudley's creditors. Ludvigh v. Amer. Woollen Co., 231 U. S. 522, 34 Sup. Ct. 161, 58 L. Ed. 345. Indeed, that case was much stronger for the trustee, because the bankrupt might charge such prices as he pleased, and keep as his commission the difference between the invoice and the sale price. In short, the profit of the transaction was his, and so was the risk. With the utmost deference, it has always been hard for me to see why the case was not a sale; but, since it was not, the case at bar certainly cannot be invalid as against the factor's creditors. Indeed, once I have found, as I have, that the situation is that of del credere factor, it scarcely seems worth while to go further.

[2] The law might, of course, make goods liable to the debts of any bailee to whom the owner entrusted them. The possibility of raising a fictitious credit by such means undoubtedly exists, and with it of harm to creditors. Yet this has never been so, and it would obviously destroy the basis upon which enormous transactions take place daily. In a sense there seems little difference between selling goods with a purchase-money mortgage, and leaving them in a factor's possession to sell. But, wisely or not, an owner may safely do as much if he do not aid the factor in falsely representing the goods as his. The line is drawn at the passage of title, and the owner does not begin to lose any of his rights until he becomes privy to some deceit by the factor.

Miller Rubber Co. v. Citizens' etc., Co. (C. C. A. 9) 233 Fed. 488, 147 C. C. A. 374, was a case where the contract was held to be a fraudulent cover for a sale, because the factor was allowed to mix the goods with his own, and because the principal gave him stationery by which he might represent them as his own. These circumstances were thought enough in the case of automobile tires to make the contract fraudulent. In the case at bar there are no such circumstances. It is argued that Dudley was allowed to mingle the goods with its own, but that is true only figuratively. The fish were in warehouses, and were stored un-

der separate receipts. No creditor goes to the warehouse to see how the goods are physically laid away. The situation is wholly different from a mixed stock of loose chattels, like automobile tires in a shop.

Further, it is urged that Dudley sold the goods in its own name. So they did, and so Seacoast doubtless knew that they did. If a question had arisen as to Dudley's power to sell, no doubt these circumstances might have been relevant in favor of the buyer; but it is impossible to see how they can be relevant as respects creditors. If a factor sells his principal's goods in his own name with his principal's knowledge, it is no fraud upon his creditors for the principal to reclaim such of the goods as the factor has not sold. The representation cannot go further than the goods in respect of which it is made, which by hypothesis are sold at the time of the representation. The principal's implied consent involves no representations to creditors of the character of the factor's interest in other goods.

Taylor v. Fram (C. C. A. 2), 252 Fed. 467, 164 C. C. A. 389, was also quite a different case. The Circuit Court of Appeals did not hold that the agreement was fraudulent per se, but that the parties made no effort to live up to it, and that for that reason it was no more than the cover for an effort in effect to sell the goods and keep a secret lien upon them in the seller's favor. The agreement at bar was lived up to in all respects, except that in 1923 Dudley had filed no accounts of its sales until bankruptcy. That was, indeed, slack, very slack, business; but, while this was probably due to Breaker's control of both parties, it was in no sense because the arrangements were not bona fide. It would have been absurd for Seacoast intentionally to accept as a buyer a firm which was showing itself doubtful as a factor. When such a one begins to exhibit symptoms of financial decrepitude, the principal would be the last of all to step into the position of creditor. There was nothing whatever to be inferred from the delays in submitting the accounts and in remitting for the sales made, except that Breaker was abusing his position as president of Seacoast by allowing Dudley to remain in default.

[3] The trustees chiefly rely, not on these considerations, but upon certain misrepresentations made in financial statements to the banks on which Dudley got very large loans in January, 1923. The theory of the estoppel is this. It had been the earlier custom of Dudley in making up such statements to show the advances which it had made as factor and the amounts which it had received in payment. The difference was properly enough an asset of its own. In Breaker's statements of 1920, 1921, and 1922 he did not follow this course, but, on the contrary, put in as a part of Dudley's assets all the sums due upon Seacoast's fish which had been sold through them, including, I assume, both that delivered direct by Seacoast, and that delivered by Dudley from consigned shipments. In so doing he represented to the banks that these accounts from customers were Dudley's assets. This took place with the privity of Seacoast, and by their failure to dissent, or advise the creditors, the company became estopped to claim, as to its own, not only the proceeds of those accounts, but the goods on consignment as well.

The claim, therefore, rests upon the theory that Breaker represented to the creditors that the goods in suit belonged to Dudley. Where are such representations to be found? The financial statements for 1920, 1921, and 1922 were all alike. The assets as set forth consisted of the cash on hand, the building, bills receivable, and accounts receivable. No inventory was mentioned; no advances on goods; there was no indication that Dudley had any interest of any kind in any goods. How it can be supposed that such a statement held out the fish then on storage as owned by Dudley I confess I do not see. The only case cited in support of this curious proposition is Taylor v. Fram, supra. It seems unnecessary to repeat what I said a moment ago. The contract there at bar was held to be a mere cloak for a sale, reserving a covert lien. The result was, of course, to allow the trustees to reclaim the goods which the seller had retaken. The representation now at bar, to succeed at all, must have included the goods as well as the cash. No creditor had the least right from it to make any inferences respecting the ownership of the fish in storage. I do not really see what more can be said, because the matter seems to me too plain for argument.

I have, of course, assumed in the foregoing that Seacoast was privy to Breaker's frauds, and that they were frauds. In fact, Seacoast was not so privy. Assuming that Breaker was engaged in a deceit upon the banks, he did it for Dudley, and as their agent. While so acting, he was in no sense the agent of Seacoast. Perhaps that is not the claim. Rather it seems to be that the knowledge—i. e., the knowledge of his own deceits—which he got when he perpetrated them is to be imputed to Seacoast, and Seacoast's inaction is to be construed as an acquiescence in the results though these were for the immediate benefit of Dudley. The petitioner is wrong in supposing that such a situation is analogous to that where the agent is engaged in defrauding his principal. Breaker was defrauding the banks, if he was defrauding any one; certainly he was not defrauding either Dudley or Seacoast. But the trustees' argument is equally erroneous. Breaker committed the fraud, as I have said, while acting as agent for Dudley; his act was not within the scope of any authority he had from Seacoast, and was not done for its sake. Let me suppose that, because he was also president of Seacoast, that company is charged with notice that Dudley was committing a fraud on its own creditors. Seacoast did not for that reason become privy to that fraud. To present the case more clearly, let me consider the statements of 1920 and 1921, separately, when Whitmarsh was still president of Seacoast, and let me suppose that he had learned that Breaker was issuing these fraudulent statements to Dudley's banks. Would Seacoast be responsible for the truth of those statements because Whitmarsh did not undeceive the banks? Clearly not. Seacoast owed no duty to Dudley's creditors; any matters between them were res inter alios acta.

Had the representations been for the benefit of Seacoast, and had Seacoast taken any advantage of them, it would be another matter. But all that Seacoast could get was a possible interest as creditor in the assets of a debtor, who, if one choose to say so, was insolvent. I

know of no rule by which a third person in such a position becomes particeps criminis. I know of no rule by which, on pain of sharing in his guilt, one must uncloak a wrongdoer merely because he is one's debtor, even one's insolvent debtor. To establish such a relation, the accomplice must either take an active part by advice or persuasion, or he must be under a positive duty to act, or it must be shown that the wrong was done on his behalf, and that he later accepted some share of the proceeds.

Therefore I hold that the petitioner is entitled to recover the cases in question; that is, all those which were shipped to Dudley on "consignment orders," or "price orders." The practice on this motion was anomalous; exceptions should have been filed to the report, and the exceptions noticed for argument. However, no point was raised of the irregularity, and I can proceed directly on the petition, answer, and evidence. Therefore the petitioner may take its decree, notwithstanding the report.

In conclusion, I wish to add a word as to the discourteous tone of parts of the petitioner's brief towards the referee. It is not within permissible bounds to speak of the finding of a judicial officer as "nonsense," nor is it, in my judgment, mannerly for counsel to treat so contemptuously an opinion which has gone against them. Besides, I may perhaps be allowed to add, it is never effective with the judge before whom the appeal comes up.

Settle order on notice.