[Civ. No. 15510.   First Dist., Div. One.   Aug. 25, 1953.]

R. H. SHAFFORD, Respondent, v. OTTO SALES COMPANY, INC. (a Corporation) et al., Appellants.

Fabian D. Brown for Appellants.

Dana, Bledsore & Smith and R. S. Cathcart for Respondent.

PETERS, P. J.—Plaintiff, R. H. Shafford, brought this action against Otto Sales Company, Inc. (hereafter referred to as Otto Sales), and against the senior Walter E. Otto, president and general manager of Otto Sales, to recover commissions claimed to be due to him under the terms of an oral agreement. Based upon a jury verdict, he recovered judgment against both defendants in the sum of $15,760.20, with interest, and costs. Both defendants appeal.

Both appellants urge that the judgment for commissions cannot stand because, under the terms of his contract, Shafford was to receive commissions only on all *sales* of coconut made by Otto Sales to the B & O Nut Company (hereafter called B & O) and, so it is claimed, there is no evidence that any such sales were made. While appellants admit that many coconut transactions between Otto Sales and B & O occurred, it is claimed that none of them involved sales between the two, but that in all of them B & O acted as a factor or agent for Otto Sales and was not a purchaser. The individual appellant urges, in addition, that the judgment against him personally cannot stand because the transaction was a corporate one, and, so it is claimed, there is no evidence that justified the court in disregarding the corporate entity so as to hold him personally.

Before the facts are set forth, the main characters in this case should be identified.

Respondent Shafford, one of the two witnesses for respondent, is a licensed broker and the sole owner of an unincorporated brokerage business located in Los Angeles and Chicago and known as "Worthington Sales Associates." It is his business to bring sellers of commodities into contact with purchasers, for which service he receives a commission.

Walter E. Otto, the sole witness for appellants, has been self-employed as an import and export merchant since 1919, and, so he testified, has "never worked for anybody else." He, and the corporation later formed, operate from San Francisco. Prior to 1947 he did business as "W. E. Otto." At some undisclosed time in that year he incorporated the Otto Sales Company, Inc. He testified that the corporation was formed because he was busy, and because his family wanted to invest money in the business; that his wife and two children each invested a substantial sum of their money in the corporation; that he is the owner of but one-third of the shares of the company; that he and his family own 150 of the 15?

shares of Otto Sales, the other three shares being held by an employee.

Otto Sales was engaged in both the import and export business. The import business consisted of buying commodities abroad and selling them to purchasers here, either through salesmen employed by Otto Sales or through independent brokers. The product involved in the present action is desiccated coconut. Until Otto Sales made the Philippine connections hereafter described it was getting some coconut from producers in India and Ceylon, but was not itself engaged in the production of coconut.

B. J. Grantier, the only other witness for respondent, was in charge of the import department, first for Otto and then for Otto Sales. He testified through a deposition inasmuch as he was to be out of the country at the time of trial. This deposition was taken at a time when Otto Sales and Walter Otto, Jr., (later dismissed) had been served in the action, but before Otto, Sr., had been individually served or had appeared. Both counsel agreed that this was so. The trial court ruled that the deposition was admissible only against the corporation and Otto, Jr. So far as the deposition not constituting evidence against Otto, Sr., is concerned, that ruling was correct. (*Overton* v. *Harband,* 6 Cal.App.2d 455 [44 P.2d 484].) Grantier testified that Otto was domineering, refused to delegate authority, was the only one exercising any real power in the corporation, and made all important decisions.

We turn now to a discussion of the events leading up to the present controversy. On this appeal it is admitted by appellants that Shafford and Otto Sales entered into a contract on January 9, 1948, whereby Shafford was to receive a commission on all sales of coconut by Otto Sales to B & O. The negotiations between the parties, leading up to that contract, are important. During the war many of the coconut plantations in the Far East had been destroyed. In 1947, when the candy business in this country resumed upon the termination of rationing, there was a great demand for coconut, and but a very limited supply. In the early part of 1947 Shafford had learned that Otto or Otto Sales had coconut for sale, and communicated with them looking towards sales to his clients. In fact, Shafford had made offerings to his clients based upon listings furnished him by Otto or Otto Sales. Two of the documents upon which Shafford relies to establish Otto's misuse of the corporate entity belong to this

early period. One was the initial communication between Shafford and appellants. It is a form letter dated January 30, 1947, and sent to the trade and to Shafford by "W. E. Otto," setting forth the terms of an offering of Ceylon desiccated coconut. It should be noted that this letter was sent about a year before the contract for commissions was entered into. Just when, in 1947, Otto Sales was incorporated, does not appear. Thus, this letter may have been sent prior to the incorporation of Otto Sales.

The second document is a form contract captioned "W. E. Otto" sent to Shafford in August, 1947, with a letter under the name "Otto Sales Company," telling Shafford that such contracts should be signed by Shafford or his customers. The contract form contains blanks, including one for acceptance by "W. E. Otto." Shafford used this form of contract in several transactions. All other later letters, telegrams and other communications were sent out by Otto Sales.

Under date of November 4, 1947, Grantier, for the corporation, wrote to Shafford to the effect that the corporation wanted to deal exclusively through Shafford in making coconut sales rather than employ a sales force, and that a definite agreement should be executed as soon as a regular source of supply of coconut could be secured. Prior to this date Shafford had already contacted B & O as a prospective client, hoping to secure coconut for that corporation through Otto Sales.

In the fall of 1947 Otto went to the Philippines looking for a coconut supply. On December 17, 1947, he signed a contract with one Angel Reyes, the owner of a desiccated coconut plant on Luzon, whereby Otto Sales obtained complete control over the operation and products of the plant for one year. The agreement provided for a 50-50 split of profits between the Otto Sales and Reyes. This was the first time Otto Sales had entered into the production end of the business.

Shafford was notified of this source of supply and immediately came to San Francisco and talked first to Grantier, and, upon his return, to Otto. Shafford was informed that the Luzon plant had a potential of 16,000 pounds of shredded coconut per day, but that $75,000 was needed to finance the first month's production. Shafford stated that he would try to secure the needed financing. At this conference Shafford was promised a 5 per cent commission on all sales for one year, and was handed a letter from Otto Sales describing the need for $75,000 financing and setting forth the terms

under which Shafford could offer the coconut to be produced and processed in the then unfinished plant.

On January 6, 1948, Otto Sales sent Shafford a telegram offering 300,000 pounds of coconut for February, March and April, at a designated price, but requiring purchases to be financed by letters of credit plus a deposit of ten cents a pound upon placing the order. The telegram stated that the quoted prices included a 5 per cent commission for Shafford. Shafford immediately communicated with Oppenheimer, president and manager of B & O. That company expressed a desire to purchase 600,000 pounds of coconut during the year, and Shafford told Oppenheimer that his source was ready to furnish that amount and much more. Oppenheimer, by telegram to Shafford, stated his acquiescence in the price offered, but not in the terms of payment, being disturbed about the required deposit of ten cents a pound. Shafford thereupon notified Otto Sales that he had a potential customer, and that company requested Shafford to come to San Francisco on January 9, 1948, to discuss this prospective sale.

The conference was held on the date specified. Shafford had not yet disclosed to Otto Sales the name of his prospective purchaser, nor had he disclosed to B & O his prospective source of supply. He told Otto that he had a buyer who was then in San Francisco who wanted about a million pounds, and that he, Shafford, wanted a letter confirming the 5 per cent commission promised in the telegram. Otto dictated to Grantier such a letter, which contained a blank line for the name of the yet undisclosed purchaser, in which it was agreed that Shafford was to receive a 5 per cent commission on all sales to such purchaser up to one million pounds. This letter was not signed.

Shafford testified that he then asked Oppenheimer to come to the office of Otto Sales to meet the source of supply, and disclosed the name of the purchaser to Otto. The names of B & O and Oppenheimer were then typed in the blank space of Shafford's letter. Before Oppenheimer arrived, according to Shafford, Otto told him that he knew of Oppenheimer's financial standing and believed that he would want to buy the entire output of the Luzon plant, which would be far in excess of a million pounds a year. For that reason he suggested that he would not deliver to Shafford the 5 per cent commission letter until after they had talked to Oppenheimer. If Oppenheimer agreed to purchase more than a million pounds Otto stated that another letter would be drafted giving

Shafford a 5 per cent commission on the total sale. This testimony was corroborated by Grantier. Otto denied that the 5 per cent commission letter had been drafted and denied discussing the 5 per cent commission with Shafford at this time. This testimony was obviously disbelieved by the jury.

At about this point Oppenheimer, accompanied by an associate, arrived and Shafford introduced the two to Otto, his son and to Grantier. A two-hour conference ensued during which the terms of the prospective sale, costs, fixing of prices, financing, and gross profits were discussed. Otto spoke of the need for $75,000 financing but did not directly ask Oppenheimer to have his company advance that sum. Specific figures for sales could not be set because the Luzon plant was not yet in production, but approximate figures were discussed. There was no definite agreement as to purchase price. Shafford testified that he told the parties that price was up to the buyer and seller, that he was to receive a commission only in the event a sale to B & O was consummated, and that all agreed that a 5 per cent commission was to be paid him on the deal. The conference ended with Oppenheimer stating that he thought it was a deal, but would get in touch with Otto after consulting his bankers and lawyers.

Grantier, in his deposition, testified that Otto had stated that Shafford was to receive a 5 per cent commission whether part or all of the output was sold to B & O and was entitled to such commission whether the deal was a long term or short term one. Grantier recalled that Oppenheimer agreed that B & O would take the entire output at 29 cents a pound, with a sliding scale adjustment, but that Oppenheimer did not like the ten cents a pound cash deposit requirement and was not sure that his company would advance $75,000. Grantier also stated that it was agreed that Shafford's 5 per cent commission was to be in addition to a 7 per cent commission to be paid to Otto. Most of this testimony was denied by Otto.

Shafford and Grantier testified that at the end of the conference Otto told Shafford to await word from him as to when B & O was to sign the contract. Shafford returned to Los Angeles to await this notification.

Grantier testified that after Shafford had left, Otto told him to draw up another contract offering Shafford a 5 per cent commission on but 300,000 pounds, instead of the one million contained in the original letter which had not been delivered to Shafford; that he thereupon tore up the million-pound commission letter and typed the new one as directed; that

later Otto asked Grantier if either letter had been signed and, upon learning that neither had, the newly-drawn second letter was torn up.

Shafford testified that he never saw Otto again after the January 9th conference. He sent three letters to Otto Sales between January 14 and 21, 1948, inquiring as to what was happening on the B & O deal, and stating that he had other prospective buyers who would like to get some of the coconut if B & O did not buy it all. On January 21, 1948, Otto, on behalf of Otto Sales, wrote to Shafford telling him that despite earlier optimism it now looked doubtful whether B & O would complete the deal. The letter stated: ''We do not want you to press or discuss this matter with B & O Nut Company until we have concluded negotiations as when we have concluded negotiations we will advise you what the results have been.'' It is a reasonable inference from this letter that Otto was thus trying to prevent Shafford from communicating with B & O about the deal.

On January 28, 1948, Otto, for Otto Sales, again wrote to Shafford, curtly telling him that the deal with B & O ''fell through''; that the plant was to be financed from another source, and that no coconut was being offered until March when the plant would be ready. In response to another letter, Otto, on behalf of Otto Sales, informed Shafford that the B & O deal fell through because that company was not willing to assume the risks involved, and that financing had been secured elsewhere.

A year and a half later, under date of October 26, 1949, Shafford wrote a letter addressed to Otto and to Otto Sales in which he stated that he had secured information that Otto Sales had sold coconut to B & O and demanding his commission. Otto, under date of November 1, 1949, on behalf of Otto Sales, wrote to Shafford denying the accusation and again stating that B & O had been unwilling to finance the deal, and that such financing had been secured from W. E. Dean.

Grantier testified that he saw Otto and Oppenheimer together on January 10, 1948, the date after the San Francisco conference, and that on January 12th Otto told him ''specifically that B & O Nut Company had signed a contract to buy the output of the plant, and that he had found an individual, a separate individual, to finance the plant.'' Otto directed Grantier to offer no more coconut for sale, and not to communicate with Shafford. Thereafter, Grantier was ab-

sent from the office for a short period, and when he returned he saw one of Shafford's letters. He told Otto that Shafford was entitled to an explanation. Otto then directed Grantier to tell Shafford the B & O deal had fallen through. Thereafter, Otto was "evasive" about the deal. Later he ordered Grantier to get quotations on specially made coconut bags and some 25,000 were secured upon an order that specifically requested that the name of the company be left off. He also testified that no coconut was sold to any other purchaser between December of 1947 and February 15, 1948, when he was dismissed by Otto.

In February of 1948, Angel Reyes, the owner of the Luzon plant, agreed with Otto personally to extend the prior contract for operation of the plant for a two-year term.

What happened after January 9, 1948, and the actual transactions between Otto Sales and B & O were described by Otto, in his direct examination or when called under section 2055 of the Code of Civil Procedure. He testified, and offered a contract to prove it, that Dean and Company, about January 28, 1948, had advanced the $75,000 needed to finance the Luzon plant. According to the terms of the Dean contract that company loaned the $75,000 to Otto Sales upon the condition of the formation of a joint venture, with Dean furnishing the money for operation, and with Otto Sales furnishing the Reyes contract. It was provided that the joint venture would organize a corporation with each of the contracting parties holding one-half of the shares, but with a 7½ per cent commission payable to Otto Sales before computation of profits. Such a corporation, with the agreed stock ownership, called "Luzon Desiccated Coconut Corporation" was formed on April 30, 1948. Otto testified that under the Dean agreement Otto Sales retained complete control over the operations of Luzon Desiccated.

Otto categorically deneid that B & O ever offered to buy, or that it ever bought, all or any part of the output of the Luzon plant. He claimed that all deals between Otto Sales and B & O were based on a factor's agreement. In support of this contention he introduced a contract between B & O and Otto Sales dated March 3, 1948, by which B & O was to become the "sole selling agent" for all coconut from the Luzon plant for one year at a commission of 6½ per cent exclusive of expenses. While this contract provided for the rendition of accounts from B & O to Otto Sales, and generally provided that Otto Sales would set the price at which the

coconut was to be sold, it also provided that B & O was to provide letters of credit two weeks in advance of production, and that B & O had the option to sell at its own price if shipped goods remained unsold for 30 days at the dock or warehouse. A March 4, 1948, supplementary clause required B & O to supply Otto Sales with the names of buyers of the coconut. Otto testified that this contract comprised the entire deal with B & O. Obviously, the contract did not amount to a sale of any coconut to B & O but constituted B & O selling agent or factor for Otto Sales. But the real question is, what did the parties do under this contract and how did they do it?

Otto admitted that with the exception of June and July, large shipments of coconut from Luzon Desiccated had been made by Otto Sales to B & O in the months from April to October, 1948. No issue of the amount of such shipments is involved on this appeal. These shipments were made pursuant to certain printed documents in which there were blanks for the insertion of certain information. They list the grades, prices and quantities of coconut involved in the particular shipment, provide how much has been paid and how much is due and is to be paid under the particular invoice. They all contain the following heading, the portions that are type-written being indicated by the parenthesis:

"LUZON DESICCATED COCONUT CORPORATION

PAGSANJAN, LAGUNA, P.I.

INVOICE FOR GOODS DELIVERED

Purchased by    (B & O Nut Company)

Address          (San Francisco, California)

Port of Discharge   (Same)

Consigned to       (Same)                          ''

Twenty-six of these invoices, all describing B & O as the purchaser, were introduced into evidence. At the trial there was some quibbling over whether these documents were or were not "invoices." The documents declare themselves to be invoices not only as indicated above but in several other unquoted portions of the documents, and Otto conceded that all of these invoices were paid to Luzon Desiccated and that Luzon Desiccated received its money from B & O upon the invoices when the coconut was loaded on ships in the Philippines.

Otto testified that B & O received the coconut pursuant to these documents and then sold it pursuant to the April agreement, receiving a commission as provided in that agreement. The agreement with B & O was terminated by Otto on October 12, 1948. No one connected with B & O was called as a witness.

On this evidence the jury on instructions unchallenged on this appeal brought in a verdict of $15,760.20 against both defendants.

Both appellants point out that admittedly, under Shafford's contract, he was to receive a commission only if a sale of coconut was made to B & O, and contend that the evidence shows without conflict that no such sale was ever made. Less than two pages of a five and a half page opening brief are devoted to this issue in which no case authority at all is cited, and the closing brief is but little more complete. It is somewhat difficult to follow appellants' incomplete and undeveloped argument, but it seems to be that the evidence, without conflict, shows that under the agency contract with B & O, Otto Sales purchased the coconut from Luzon Desiccated using and employing the credit of B & O as a factor, agreeing to pay it as a factor a commission on sales to third persons effectuated by it, and reimbursing it as factor for unsold merchandise at the termination of the contract. Section 2026 of the Civil Code is cited as the sole authority in support of this conclusion. It reads: "A factor is an agent who, in the pursuit of an independent calling, is employed by another to sell property for him, and is vested by the latter with the possession or control of the property, or authorized to receive payment therefor from the purchaser."

The appellants attempt to explain away the invoices, describing B & O as the purchaser by the contention that they constitute mere fragments of evidence contradicted by the evidence as to the transaction as a whole, and therefore (so it is claimed) must be disregarded.

There is no doubt that the written contract between B & O and Otto Sales generally purported to be an agency contract and did not provide for the sale to B & O of any coconut. But, of course, an agency contract, such as one appointing a factor or creating a bailment, can be shown to be a sham by third parties by other provisions of the contract or by the surrounding circumstances. That is, it can be shown that the agency contract is a mere mask to hide a true

sale between the parties. Where such evidence is produced the question of whether or not a sale took place becomes a jury question. (*Miller Rubber Co.* v. *Citizens' Trust & Sav. Bank,* 233 F. 488 [147 C.C.A. 374] ; *Reliance Shoe Co.* v. *Manly,* 25 F.2d 381; *In re Heckathorn,* 144 F. 499; *In re Penny & Anderson,* 176 F. 141; *Standard Fashion Co.* v. *Magrane-Houston Co.,* 258 U.S. 346 [42 S.Ct. 360, 66 L.Ed. 653] ; *United States* v. *City & County of San Francisco,* 23 F.Supp. 40, 106 F.2d 569, 310 U.S. 16 [60 S.Ct. 749, 84 L.Ed. 1050] ; see, also, cases collected 22 Am.Jur. p. 309, § 5; 2 C.J.S. p. 1031, § 2(i) ; 12 Cal.Jur. p. 411, § 2.) This is a rule of common sense. ■ As the above cited cases indicate, mere verbal formulas, mere words and the ingenuity of contractual expression dreamed up by ingenious business men or their lawyers cannot be used to prevent a showing of the real nature of the transaction. It is substance and not form that controls.

■ The evidence already set forth at some length is susceptible of the reasonable interpretation that the March 3, 1948, contract between B & O and Otto Sales was made in bad faith and was part of a general course of conduct whereby Otto Sales attempted to disguise actual sales to B & O as a factoring arrangement in order to defeat Shafford's right to commissions. The fact that the invoices described B & O as the purchaser is alone sufficient to support the implied finding of the jury that the transactions were sales. This is strongly supported by the evidence that B & O paid Luzon Desiccated, which at all times was completely controlled by Otto Sales, in cash before the goods were shipped. (*Alamitos Land Co.* v. *Texas Co.,* 11 Cal.App.2d 614 [54 P.2d 489].) There is also Grantier's evidence that Otto had told him that B & O had contracted to buy the entire plant output. The contention that the literal terms of the contract alone must govern, in the face of this evidence, approaches the frivolous.

■ But the second point raised by appellant Otto personally presents a more difficult proposition. It is urged that there was insufficient evidence upon which to hold him personally on a corporation contract in the absence of evidence that he used the corporate entity as a shield for fraudulent activities. On this issue all of Grantier's testimony must be disregarded. As already pointed out, his testimony was not admitted as against Otto. As so limited, what does the record show on this issue? It shows that Otto was the president and general manager of the corporation; that, although he

and his family owned practically all of the stock, Otto owned personally only one-third of such stock, and that his family invested their own money in the stock purchased by them. There is no evidence that the corporation was used as a shield by Otto to cover up his activities as an individual. There is no evidence that Shafford believed he was dealing with Otto personally, or placed any reliance in such belief. There is no evidence that the corporation is undercapitalized or not financially responsible. There is no evidence that any inequitable result will follow by refusing to disregard the corporate entity.

Respondent calls attention to the mimeographed offering of coconut by Otto personally in January of 1947, but there is no evidence that Otto Sales had even been organized at that time. Such offering did not mislead Shafford, a year later, during which year many corporate communications had been made to him. Respondent also calls attention to the transmission of the contract forms personally by Otto in August, 1947. This was a minor matter and cannot be held to be controlling. Respondent also asserts that Otto's untruthful and evasive testimony in other connections, and his attempts at concealment, would justify the jury in believing that he would also fraudulently hide behind a corporation as his alter ego. But just how the right to disbelieve Otto as a witness can support a positive finding of misuse of the corporate entity does not appear. ■ Breach of contract by the corporation, even though fraudulently concealed, does not support an inference that the corporate entity was being misused for personal purposes.

The only case cited by appellant in his opening brief in his two-page discussion of this problem is *Wenban Estate, Inc.* v. *Hewlett,* 193 Cal. 675 [227 P. 723]. That case laid down the following test at page 697: ''Thus proof that an individual owns all of the stock of a corporation and that the corporation is in truth and in fact but the corporate double of the owner of the stock, will, in conjunction with a further showing that as a result of the double relationship fraud or injustice will inure to a third person, suffice to dissipate the separate identity of the corporation.''

The case also held (p. 698) that it ''is not necessary that actual fraud be shown. It is sufficient if a refusal to recognize the fact of the identity of the corporate existence with that of the individual would bring about inequitable results.''

There are many cases that could have been cited holding that sole ownership and actual control are not enough to warrant a court in piercing the corporate veil. (See, for example, *Hollywood Cleaning & P. Co.* v. *Hollywood L. Service*, 217 Cal. 124 [17 P.2d 709]; *Erkenbrecher* v. *Grant*, 187 Cal. 7 [200 P. 641]; *Dos Pueblos Ranch & Imp. Co.* v. *Ellis*, 8 Cal.2d 617 [67 P.2d 340]; *Carlesimo* v. *Schwebel*, 87 Cal. App.2d 482 [197 P.2d 167]; *Norrins Realty Co.* v. *Consolidated A. & T. G. Co.*, 80 Cal.App.2d 879 [182 P.2d 593]; *Judelson* v. *American Metal Bearing Co.*, 89 Cal.App.2d 256 [200 P.2d 836]; *Consolidated etc. Industries, Inc.* v. *Marks*, 109 Cal.App.2d 310 [240 P.2d 718]; *Gardner* v. *Rutherford*, 57 Cal.App.2d 874 [136 P.2d 48]; *Estate of Greenwald*, 19 Cal.App.2d 291 [65 P.2d 70]; *California Emp. Com.* v. *Butte County etc. Assn.*, 25 Cal.2d 624 [154 P.2d 892]; *Estate of Winder*, 99 Cal.App.2d 83 [221 P.2d 193]; *Estate of Barreiro*, 125 Cal.App. 752 [14 P.2d 786]; see discussion in 31 Cal.L.Rev. 426.) ■ These cases recognize that the formation of even a one-man corporation to obtain limited liability is a proper objective unless used for improper purposes. They hold that complete stock ownership and actual one-man control will not alone be sufficient to impose liability on the individual. In the absence of confusion of corporate with individual affairs, or failing to disclose to third parties the existence of the two entities, or abuse or bad faith in the exercise of corporate control, the corporate entity will not be disregarded.

There are other cases that contain some language somewhat inconsistent with some of the language in the above-cited cases, and in which the corporate entity has been disregarded where there was one-man ownership and control, but also at least some, if slight, evidence of unfairness, inequitable results, or confusion of parties. (See *D. N. & E. Walter & Co.* v. *Zuckerman*, 214 Cal. 418 [6 P.2d 251]; *Wittmann* v. *Whittingham*, 85 Cal.App. 140 [259 P. 63]; *Sime* v. *Malouf*, 95 Cal. App.2d 82 [212 P.2d 946, 213 P.2d 788]; *Kohn* v. *Kohn*, 95 Cal.App.2d 708 [214 P.2d 71]; *Stark* v. *Coker*, 20 Cal.2d 839 [129 P.2d 390]; *Watson* v. *Commonwealth Ins. Co.*, 8 Cal.2d 61 [63 P.2d 295]; *Thomson* v. *L. C. Roney & Co.*, 112 Cal. App.2d 420 [246 P.2d 1017].)

■ In the instant case, applying the most liberal rule adopted by the courts in this field, it must be held that the evidence is insufficient to support a judgment against Otto

personally. The most that the evidence shows is one-man ownership (through his family), and perhaps one-man control. The two personal documents sent to Shafford were too remote to sustain a finding of confusion of identities. There is no evidence of such confusion. Shafford did not testify that he believed or was led to believe that he was dealing with Otto personally. There is no evidence at all that any inequitable or unfair result will result from refusing to impose personal liability upon Otto. This being so, the judgment against him cannot stand.

The judgment against Walter E. Otto is reversed; the judgment against Otto Sales Company, Inc., is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied October 22, 1953. Carter, J., was of the opinion that the petition should be granted.