[Civ. No. 6744. Third Dist. Nov. 14, 1941.]

UNITED MILK PRODUCERS OF CALIFORNIA (a Cooperative Marketing Association) et al., Petitioners, v. W. J. CECIL, as Director of Agriculture, etc., et al., Respondents.

Carleton L. Rank, Pillsbury, Madison & Sutro, Eugene M. Prince and Thomas E. Stanton for Petitioners.

Earl Warren, Attorney General, W. T. Sweigert, Assistant Attorney General, and Walter L. Bowers and W. R. Augustine, Deputies Attorney General, for Respondents.

Howard B. Crittenden, Jr., as *Amicus Curiae*, on behalf of Respondents.

TUTTLE, J.—Petitioners seek by writ of mandate to compel respondent Director of Agriculture of California to forthwith rescind and revoke an order made by him denying milk distributors' licenses to them, and also to compel said director to issue to each of petitioners such licenses for the year 1941. An alternative writ was issued by this court, and a demurrer to said petition was filed by the Attorney General on behalf of respondents. All parties agree that the petition sets forth all necessary facts, and that decision of this court upon the demurrer will dispose of the entire litigation.

Under the provisions of section 737.11 of the Agricultural Code, orders to show cause were issued by the Director of Agriculture (hereinafter referred to as the "Director"), why petitioners' licenses should not be revoked. A hearing was had, at which petitioners both appeared. Oral and documentary evidence was introduced, the transcript of said hearing being some two hundred pages in length. Upon the conclusion of said hearing, the order under attack here was made and entered.

The refusal to grant a license, or the suspension or revocation of a license may occur "when he (the 'Director') is satisfied that any applicant or licensee has violated any provision of this chapter (div. IV, chapter 10, Agricultural Code), or any· provision of any stabilization and marketing

plan formulated under the provisions of this chapter."
(Agricultural Code, section 737.11.) No exception is taken
by petitioners to the facts found by the "Director." Such
findings are very exhaustive, and take up some eighteen
pages of the petition. It may thus be properly concluded
that the facts found were proven at said hearing. The
order of revocation was not absolute, it being provided "that
such application of said respondent, The Borden Company,
may be renewed upon presentation of satisfactory evidence
to the Director of Agriculture that said contract between
it and United Milk Producers of California, dated August
1, 1940, has been terminated and abandoned, and that said,
The Borden Company has paid to the individual producer-
members and to all other producers from whom it has received
fluid milk since August 1, 1940, the full, applicable minimum
prices therefor as established under the stabilization and
marketing plan or plans effective during said time."

As we view the several contentions of the parties, the
real question is whether or not the "Director" has authority,
under the Milk Control Act (Agricultural Code of California,
chapter 10, div. IV), to fix the minimum price which must
be paid to its members by cooperative marketing associa-
tions organized under the provisions of division VI, chap-
ter 4 of said code. The litigants appear to concede that if
the Milk Control Act governs the situation, the order under
attack must be sustained. It is admitted by petitioners that
the individual producers who constitute United Milk Pro-
ducers (hereinafter referred to as "United"), for a num-
ber of months prior to, and also at the time of said hearing,
did not receive the minimum price for their milk prescribed
and fixed by the "Director." This was held by the "Di-
rector" to constitute a violation of the law and regulations
made pursuant thereto. The exact nature of the contro-
versy, and the conflicting views in respect thereto, are thus
aptly summarized by petitioners in their reply brief:

"As pointed out at the argument, the above contention of
respondents assumes the point in issue. The question is
whether the Milk Control Act requires that the equivalent
of the Directors' control prices be paid in *all* cases, or
whether under the laws of the State there is an exception
applicable to cooperatives. . . . Respondents, however, con-
tend that all cooperative-distributors, without exception, are

required by the Milk Control Act to return to their members at least the control prices. If a cooperative is unable to return the equivalent of these prices, presumably it must go out of the distributing business. This, we submit, is something which, if it is to be said, should be said by the legislature, and not by the courts. The statute does not expressly say that cooperatives must go out of the distributing business under these circumstances, and a provision of this kind, we submit, should not go into the statute by implication."

Petitioner, "United," was organized May 16, 1933, under the said provisions of the Agricultural Code relating to non-profit marketing associations (hereinafter designated as "Marketing Associations"), and passed by the legislature in 1933. From the date of its organization until August 1, 1940, "United" sold milk and cream, produced by its members, to various distributors. On August 1, 1940, "United" entered into a contract with "Borden," whereby "Borden" agreed to process and distribute the fluid milk and cream produced by the members of "United," and to return to "United" the proceeds of such operations less all expenses of operation and compensation to "Borden," all as specified in the contract. The contract was to continue for two years and thereafter until terminated by either party upon six months' notice. Ever since August 1, 1940, "United" and "Borden" have been, and they now are operating under the contract, and "Borden" has accounted to "United" for the proceeds of such operations, less the deductions provided in the contract.

In 1937, the Milk Control Act was passed. The first section thereof (Agricultural Code, section 735), is headed, "Legislative Declaration," and it reads in part as follows:

"(a) The production and distribution of fluid milk and of fluid cream and the dissemination of accurate, scientific information as to the importance of milk and other dairy products in the maintenance of a high level of public health, is hereby declared to be a business affected with a public interest. The provisions of this chapter are enacted in the exercise of police powers of this State for the purpose of protecting the health and welfare of the people of this State. (b) It is hereby declared that fluid milk and fluid cream are necessary articles of food for human consumption; that

the production and maintenance of an adequate supply of healthful milk of proper chemical and physical content, free from contamination, is vital to the public health and welfare, and that the production, transportation, processing, storage, distribution or sale of fluid milk and fluid cream in the State of California is an industry affecting the public health and welfare; that unfair, unjust, destructive and demoralizing trade practices have been carried on and are now being carried on in the production, marketing, sale, processing or distribution of fluid milk and fluid cream, which constitute a constant menace to the health and welfare of the inhabitants of this State and tend to undermine sanitary regulations and standards of content and purity, however effectually such sanitary regulations may be enforced; that health regulations alone are insufficient to prevent disturbances in the milk industry which threaten to destroy and seriously impair the future supply of fluid milk; and to safeguard the consuming public from future inadequacy of a supply of this necessary commodity; that it is the policy of this State to promote, foster and encourage the intelligent production and orderly marketing of commodities necessary to its citizens, including milk, and to eliminate speculation, waste, improper marketing, unfair and destructive trade practices, and improper accounting for milk purchased from producers.''

Under subsequent provisions the ''Director'' is the administrative agent of the state, and he is given authority ''To prescribe minimum prices to be paid by distributors in accordance with a stabilization and marketing plan for fluid milk. . . . '' (Sec. 735.4, subds. (b) and (4).) Section 735.3, subd. (f), provides:

'' '*Distributor*' means any person whether or not such person is a producer or *an association of producers, engaged in the business of distributing or handling fluid milk*. . . . '' (Italics ours.)

It must be admitted that on the face of the law all persons are included within its scope. Section 735.3, subd. (k), reads:

'' '*Person*' means any individual, firm, corporation, association or any other business unit.''

In 23 Cal. Jur., page 725, sec. 107, it is stated:

''It is a cardinal rule that statutes are construed according to the intention, or at least according to the apparent or evi-

dent intention or purpose, of the lawmakers. Such intention controls, if it can be reasonably ascertained from the language used. Indeed, it has been said that the legislative intent in enacting a law is the law itself.''

The foregoing provisions indicate clearly that the legislature intended to include all associations within its scope. ''United'' was an association of producers. Further indication of such intent is found in the ''legislative declaration'' quoted above. Production of milk is declared to be a business affected with a *public interest*. Production, and distribution or sale of milk is declared to be an industry *affecting health and public welfare*. It is declared to be the public policy of the state to eliminate improper marketing and unfair and destructive trade practices. From the record before us it is apparent that a considerable portion of fluid milk was, and still is distributed directly by cooperatives to consumers. It is not reasonable to suppose that the legislature intended to make an exception to that sort of distribution, in a matter of such vital concern to the people of the state. If it intended to exclude cooperatives from the application of the law, it would have so declared.

 Petitioners strongly rely upon section 1219 of the Agricultural Code, which is a portion of the law dealing with cooperative marketing associations. Said section reads as follows:

''The general corporation laws of this state and all powers and rights thereunder, shall apply to the associations organized hereunder, except where such provisions are in conflict with or inconsistent with the express provisions of this chapter.''

They argue that the foregoing section establishes a rule of construction which must control here. It will be noted, however, that it has reference only to ''the general corporation laws of this state.'' The inconsistency and conflict here do not come from such laws, but from the Agricultural Code. There is therefore no rule of construction laid down for our guidance. Furthermore, it is the general rule that one legislature cannot enact irrepealable legislation or limit or restrict its own power or the power of its successors as to the repeal of statutes, and an act of one legislature is not binding upon, and does not tie the hands of future legislatures. (59 C. J., sec. 500, pages 899, 900). In Lewis' Sutherland

Statutory Construction, vol. 1, sec. 244, pages 456, 457, the rule is thus stated:

"Every legislative body may modify or abolish the acts passed by itself or its predecessors. This power of repeal may be exercised at the same session at which the original act was passed; and even while a bill is in its progress and before it becomes a law. The legislature cannot bind a future legislature to a particular mode of repeal. It cannot declare in advance the intent of subsequent legislatures or the effect of subsequent legislation upon existing statutes."

In the same volume, section 247, pages 461–464, it is said:

"Such repeals are recognized as intended by the legislature, and its intention to repeal is ascertained as the legislative intent is ascertained in other respects, when not expressly declared, by construction. An implied repeal results from some enactment the terms and necessary operation of which cannot be harmonized with the terms and necessary effect of an earlier act. In such case the later law prevails as the last expression of the legislative will; therefore, the former law is constructively repealed, since it cannot be supposed that the law-making power intends to enact or continue in force laws which are contradictions. The repugnancy being ascertained, the later act or provision in date or position has full force, and displaces by repeal whatever in the precedent law is inconsistent with it. Subsequent legislation repeals previous inconsistent legislation whether it expressly declares such repeal or not. In the nature of things it would be so, not only on the theory of intention, but because contradictions cannot stand together. The intention to repeal, however, will not be presumed, nor the effect of repeal admitted, unless the inconsistency is unavoidable, and only to the extent of the repugnance."

It must be apparent that the Cooperative Marketing Act, passed several years prior to the Milk Control Act, was inconsistent with the latter. Under the Marketing Act, the members were permitted to enter such marketing contracts as they wished, and to distribute the proceeds from the sale of milk among themselves, after deducting necessary expenses. On the other hand, the Milk Control Act gives authority to the "Director" to fix the minimum amount which a producer may receive for his milk. In this con-

nection the word "price" is used in the latter act. Considering the act in its entirety, we think the legislature did not use that word in a technical sense, and that it can be reasonably construed to include any return which is received by the producer from the distributor in the marketing of his product. It is therefore our conclusion that the Cooperative Marketing Act, in respect to the particulars mentioned, was impliedly repealed by the Milk Control Act, and that cooperative marketing associations are distributors for their members, and therefore subject to its operation and control.

▉ Petitioners, in attempting to show lack of legislative intent to repeal, point out that a cooperative, from the very nature of its organization, cannot return the price fixed by the "Director" for milk, if its net returns are less than such price; that in cooperatives, the producer-member is the owner, and that he receives the profits from its marketing activities, and should therefore bear any loss. It must be assumed that the foregoing effect upon cooperative organizations must have been foreseen by the legislature, but that they considered that the health and general welfare of the people as a whole were paramount over such matters as the internal management of such associations, and their customary method of operation. The proof of a legislative intent to make the Milk Control Act all-inclusive is so apparent and strong that considerations of the foregoing nature must give way before it. By its very terms the act covered the distribution by "United." The burden was therefore upon "United" to show that it was excepted from the enactment. This burden, as we have indicated, they have failed to sustain.

▉ The authorities relied upon by petitioners are practically all directed toward the use and meaning of the word "price" in the Milk Control Act. It is contended that the use of that word indicates an intent to exclude cooperatives from its operation. They state:

"We assume that respondents will contend that the term 'price', as used in the Milk Control Act and in the marketing and stabilization plan, must be given a broader and more inclusive meaning than its ordinary sense in order to effect the purpose of the Act by assuring all producers a minimum

return for their milk. We point out, however, that if the term were given this broad construction, the director would be authorized to fix not only the minimum return which Borden must make to United under the agency contract, but also the minimum return which every cooperative-distributor must make to its members. In no event could the term 'price' be given a broad meaning to cover the one situation and a different and narrower meaning to exclude the other."

They rely chiefly upon the case of *Green* v. *Milk Control Commission* (1940), 340 Pa. 1, 10 [16 Atl. (2d) 9, 10], where it is said:

"The principal guiding to decision is this: The power and authority to be exercised by administrative commissions must be conferred by legislative language clear and unmistakable. . . . With the principle stated before us, turning to the law embodying the powers of the Milk Control Commission, we find nothing said about milk shipped to dealers on consignment. It speaks of the 'purchase' of milk by dealers, its 'delivery and sale' to them; it uses the words 'buy', 'purchase', 'prices', 'bought or sold', 'sell or buy.' The words 'consign' or 'consignment' nowhere appear. We are asked by the Commonwealth to interpolate these words into the Act. This we cannot do without violating the important principle to which we have adverted. If the legislature desires to change the law, this can shortly be demonstrated by an amendment at the coming session, writing into the Act a provision covering milk sent to dealers on consignment."

As stated above, we are of the opinion that the word mentioned was used in a broader sense, and that, under the statute, any producer, irrespective of how he places his milk upon the market, must receive the minimum amount fixed by the "Director." We accept the view of the dissenting opinion in the Green case, wherein the following language is used:

"Plaintiffs are a handful of dealers who have contrived an ingenious scheme by which, although for all practical purposes transactions in the business are carried on as before, a new relationship, from a legalistic standpoint, is imposed upon the contracting parties. Instead of producers selling to dealers and the latter in turn to consumers, a form of

agreement between producers and dealers has now been pre-pared whereby the dealer calls himself a 'factor' " (agent), "the milk is said to be 'consigned' to the 'factor' " (agent), "the title is to remain in the producer until the milk is sold 'whereupon it shall pass directly from producer to the person purchasing same. . . . ' The obvious purpose of this device" (as in the proceeding at bar) "is to enable the plaintiffs to obtain milk from producers at prices lower than those fixed by the Milk Control Commission. If they succeed in this attempt the force of competition will naturally compel the entire industry to adopt the same arrangement, so that price-fixing by the Commission will become a nullity, the Milk Control Law will be effectively torpedoed, and the industry will be reduced to the condition which the Act was designed to remedy. . . . The Act is not primarily aimed at *what the dealer or consumer shall pay, but what the producer shall receive.* . . . The majority opinion stresses the fact that the Milk Control Law uses only the words 'buy,' 'purchase,' 'prices,' etc.; from this it is argued that consignment transac-tions are not within the purview of the act. It has already been pointed out that these 'consignment' agreements" (just as does the contract between the petitioners in the instant case) "necessarily involve also *sales* somewhere down the line, and that the Commission is empowered to fix the minimum price to be charged in such sales and to prevent the price thus fixed from being undermined by the device of paying commis-sions to so-called 'factors' or by any similar scheme. But there is high authority even for the broader proposition that the 'consignment' phase of the transaction is itself directly subject to the power of the Commission irrespective of any subsequent sales of milk by the 'factor' (agent). In *United States* v. *Rock Royal Co-Operative, Inc.,* 307 U. S. 533, 579, 580 [59 Sup. Ct. 993, 83 L. Ed. 1446], the Court construed the word 'purchased' in the Agricultural Marketing Agreement Act of 1937, 7 U. S. C. A. § 601, et seq., as being not confined merely to technical 'sales,' but as having the more general meaning of 'acquired for marketing.' So, here, since the act defines a dealer not only as one who 'purchases' but also one who 'handles' milk, [in section 735.3 (f), California Agricul-tural Code 'distributor' is defined as anyone 'who purchases or *handles* fluid milk or fluid cream for sale'] the power to fix 'prices' as between producer and dealer properly includes

the power to regulate the terms of transactions by which the milk is merely 'acquired' by the dealer 'for marketing,' or, in other words, 'consigned,' instead of being "bought' outright by him, and particularly to prescribe the amount of commissions, if any to be allowed in such cases.

"*Having regard*, then *to the fundamental purpose* of the Milk Control Law and the *necessity* of *judicially implementing* its provisions for the welfare of the people of the Commonwealth, especially the children, the *act*, in my opinion *should not be emasculated by unduly technical construction.*" (Italics ours.)

█ It is urged by petitioners that in the 1941 session of the legislature, proposed amendments to the Milk Control Act which would have included cooperatives within its scope, failed of passage. Thus, they say, the legislature must have intended, when the original act was passed, to exclude co-operatives from its scope. While this may be some evidence of legislative intent, it can be argued with equal force, that the omission to include the amendments was due to the fact that the legislature considered that the bill already included cooperatives, and that such amendments would be mere surplusage.

We have examined the other authorities cited by petitioners, but find nothing in them which is controlling. When it comes to a question of legislative intent, that matter must be decided from the peculiar facts and circumstances of each enactment.

The parties devote considerable time to the discussion of the question whether or not the contract between petitioners was one of agency or one under which "Borden" actually purchased the milk from "United." We do not deem it necessary to discuss that phase of the matter. We have shown that "United" was subject to the provisions of the Milk Control Act. If "Borden" was its agent, as petitioners contend, they were in exactly the same predicament as their principal, and violated the Milk Control Act, as the member-producers of "United" did not receive the minimum amount fixed by the "Director" as the price of the milk.

In conclusion, we hold that there was ample evidence before the "Director" to sustain the order in question.

The demurrer to the petition is sustained and the writ denied, respondents to recover their costs.

Thompson, Acting P. J., concurred.

On December 5, 1941, the judgment was modified to read as above.