[Sac. No. 5530. In Bank. Dec. 30, 1944.]

CALIFORNIA EMPLOYMENT COMMISSION, Appellant, v. BUTTE COUNTY RICE GROWERS ASSOCIATION (a Corporation), Respondent.

Earl Warren, Attorney General, Robert W. Kenny, Attorney General, Clarence A. Linn, Doris H. Maier and John J. Dailey, Deputies Attorney General, Forrest M. Hill, Ralph R. Planteen, Miriam E. Wolff, Maurice P. McCaffrey, Leonard M. Friedman and Glenn V. Walls for Appellant.

Herbert W. Whitten, Ware & Ware and Phil Ware for Respondent.

Ivan G. McDaniel, Jack Barry, Jr., Rogers & Clark, John H. Painter, Schauer, Ryon & McMahon, Alfred D. Haines, Charles J. Janigian and Charles P. Scully as Amici Curiae on behalf of Respondent.

CURTIS, J.—This action was instituted by the California Employment Commission under authority of the California

Unemployment Insurance Act (Stats. 1935, p. 1226; as amended, Deering's Gen. Laws, 1937, Act 8780d) to recover unemployment compensation contributions, together with interest and penalties, from the Butte County Rice Growers Association upon the basis of wages paid by the association to certain employees during the period February 14, 1937, to September 30, 1939. The trial court upheld the position of the defendant that the labor involved in the activities of the association constituted "agricultural labor" and was therefore exempt from the coverage provisions of the act. From the adverse judgment accordingly entered, the plaintiff prosecutes this appeal.

The defendant is a cooperative association incorporated in 1914 under the laws providing for the formation of "nonprofit" farmers' organizations. (Civ. Code, §§ 653m-653s, added by Stats. 1909, p. 16; now in Agr. Code, §§ 1191-1221.) It owns and operates a large warehouse located near a railroad siding at Richvale, Butte County, where it stores rice and grain for shipment to market, serving alike "members" (persons who own membership certificates valued at $300 each) and "applicants for membership" (persons who have made an initial payament of $10 each). Membership is limited to owners or tenants of a minimum quantity of land in said county. At the time in question there were forty-eight paid-up members and twenty-three applicants; or according to the defendant's corporate accounts, approximately one-third of the persons entitled to use its storage facilities were so privileged upon proceeding to file an application for membership and making a nominal payment of $10. As a further part of its service, the defendant purchases and sells without profit to "members" and "applicants" certain merchandise commonly used in connection with farming operations. On occasion, according to testimony of the defendant's secretary, sales of these commodities were made to employees and might be made to other persons in the district calling at its warehouse. The defendant also operates a public scale for checking weights on truck loads of rice and other commodities incident to their movement over the highway.

At the beginning of each season it is the defendant's practice to fix a storage charge, and at the end thereof the amount collected in excess of the cost of operation is divided in the form of "rebates" among the fully *paid-up* members. "Ap-

plicants for membership'' do not share in this refund. The defendant is licensed by the State Department of Agriculture to conduct a general warehouse business and authorized to issue negotiable warehouse receipts (Agr. Code, §§ 1231-1258), which are subject to assignment and nonmember assignees pay storage charges. By reason of its maintenance of a bonded warehouse under state license, the defendant has assumed the following legal duty:

''Every warehouseman conducting a licensed warehouse shall receive for storage therein, so far as its capacity permits, any product of the kind customarily stored therein by him which may be tendered to him in a suitable condition for warehousing in the usual manner in the ordinary and usual course of business, without making any discrimination between persons desiring to avail themselves of warehouse facilities.'' (Agr. Code, § 1242.)

Except for its warehouse manager and bookkeeper each working on a yearly basis, the defendant's employees are seasonal laborers hired by its manager, who has complete supervision and control over their varied warehouse activities. It is the classification of these general services in furtherance of the defendant's enterprise that is here in question. The defendant carries Workmen's Compensation Insurance on all its employees.

The California Unemployment Insurance Act expressly excepts ''agricultural labor'' but does not expand the term in any detail. (§ 7(a).) However, plaintiff, as the administrative agency created by the act and entrusted with its enforcement (§ 75), is authorized to ''adopt and enforce rules and regulations which to it seem necessary and suitable to carry out the provisions of this act.'' (§ 90(a).) Upon this basis the plaintiff promulgated rule 7.1, effective February 14, 1937, and in force during the period here involved, which administrative aid defined the term ''agricultural labor'' as including all services performed:

''(1) By an employee on a farm, in connection with the cultivation of the soil, the raising and harvesting of crops, the raising, feeding, management of livestock, poultry, and bees; which includes, among others, the spraying, pruning, fumigating, fertilizing, irrigating, and heating which may be necessary and incident thereto;

''(2) By an employee in connection with the drying, proc-

essing, packing, packaging, transportation, and marketing of materials which are produced on the farm or articles produced from such materials, providing such drying, processing, packing, packaging, transporting, or marketing is carried on as an incident to ordinary farming operations as distinguished from manufacturing or commercial operations.

"The services hereinabove set forth do not constitute agricultural labor unless they are performed by an employee of the owner or tenant of the farm on which the materials in their raw or natural state were produced. Such services, however, do not constitute agricultural labor if they are carried on as an incident to manufacturing or commercial operations.

"As used herein the term 'farm' includes, among others, stock, dairy, poultry, fruit and truck farms, plantations, ranches, ranges, orchards and vineyards.

"Forestry and lumbering are not included within the exemption of agricultural labor."

Preliminary to the discussion of the questions raised on this appeal, there are two general points of observation to be noted. ■■■ First, in evaluating the defendant's activities to determine whether its employees are engaged in "agricultural labor," it must be remembered that the issue of classification arises in connection with the extension of an exemption from the provisions of a general welfare statute designed to reduce economic insecurity from unemployment by the levy of "contributions" or taxes upon employers and their employees for the accumulation of a reserve fund from which "benefits" can be paid to such latter persons as may become unemployed. The tax feature as to the reciprocal contributions of employers and their employees is but an incident, not the essence of the state unemployment insurance law, which in turn is integrated with the operation of comparable federal legislation. (*Gillum* v. *Johnson*, 7 Cal.2d 744 [62 P.2d 1037, 63 P.2d 810, 108 A.L.R. 595].) Such legislation is remedial in character, subject to a liberal construction to effectuate its purpose and to coincide with its reflection of public policy. (*County of Los Angeles* v. *Frisbie*, 19 Cal.2d 634 [122 P.2d 526]; *California Employment Com.* v. *Black-Foxe Military Inst.*, 43 Cal.App.2dSupp. 868 [110 P.2d 729].) In the latter case the broad coverage intent of the act here involved is recognized in the following language at page 872: "The income

tax law is purely a revenue measure, and upon the rule of strict construction applied to such laws, its scope may well be restrained to such matters as are clearly covered by it. Here we have a statute which, while it requires a 'contribution' that in itself may possibly be regarded as a tax, has a much broader object than the mere raising of revenue. It sets up a scheme for ameliorating the hardships of unemployment, and undertakes, in conjunction with the United States Government, to pay unemployment benefits to those who, without fault of their own, are out of work, to impose the financial burden of doing this upon both employers and employees, and to measure both burden and benefits by the amount of compensation paid to employees when they are working. . . . *In view of the purpose of these provisions they should not be whittled down by narrow construction, nor should exceptions not clearly justified by their language be engrafted upon them by judicial interpretation."* (Italics ours.)

█ Second, the principal reason for exempting "agricultural labor" from social and industrial benefits resulting from remedial legislation has been administrative difficulties and accounting inconveniences in farm work (*Carmichael* v. *Southern Coal & C. Co.*, 301 U.S. 495 [57 S.Ct. 868, 81 L.Ed. 1245, 109 A.L.R. 1327]), but with relation to employment in and operation and management of packing houses by respective associations, no such practical impediment exists. On the contrary, the usual economy, efficiency and skill with which such association units, functioning as adjuncts to agricultural pursuits, are operated by boards of directors and expert business managers, complemented with systematic office service, place them on no different level than other business enterprises insofar as concerns ability to comply with administrative computation procedure under unemployment compensation insurance laws. (*H. Duys & Co., Inc.* v. *Tone*, 125 Conn. 300 [5 A.2d 23].)

Now to consider the controversial issues on this appeal— the propriety of the judgment discharging the defendant from liability under the California Unemployment Insurance Act for contributions based upon wages paid to its general warehouse employees depends in the main upon the validity, interpretation and application of rule 7.1 as above quoted. The plaintiff maintains that the rule is a proper administrative aid in carrying out the intent of the act in question, and that

under such labor classification the services of the defendant's employees must be deemed commercial, not agricultural, in nature, as performed for a corporate enterprise. In opposition to these views the defendant argues that the rule unreasonably restricts the statutory labor exemption and to that extent constitutes illegal administrative legislation; and further, even accepting the challenged definition as of controlling force, the character and organization of the defendant's activities would nevertheless exclude it from the operative force of the act.

Considering at the outset the challenge of the validity of rule 7.1, the objection is not well taken. Where the Legislature has by its enactments declared policies and fixed primary standards, as it did in the Unemployment Insurance Act, there can be no question but that it may validly confer on administrative officers power to "fill up the details" by prescribing rules and regulations to promote the spirit and purpose of the legislation and its complete operation. In its general form of distinction, rule 7.1 appears to be a practical, workable definition in amplification of the unexpanded statutory exemption here presented. Practically all of the courts that have been required to pass upon regulations identical with or very similar to rule 7.1 have upheld the same as proper interpretations of the statutes involved. (*Great Western Mushroom Co.* v. *Industrial Commission* (1938), 103 Colo. 39 [82 P.2d 751]; *H. Duys & Co., Inc.* v. *Tone* (1939), 125 Conn. 300 [5 A.2d 23]; *Park Floral Co.* v. *Industrial Commission* (1939), 104 Colo. 350 [91 P.2d 492]; *Christgau* v. *Woodlawn Cemetery Assn.* (1940), 208 Minn. 263 [293 N.W. 619]; *Chester C. Fosgate Co.* v. *United States,* 5th Cir., 125 F.2d 775, writ of certiorari denied in 1942, 317 U.S. 639 [63 S.Ct. 31, 87 L.Ed. 515]; *Employment Security Commission* v. *Arizona Citrus Growers* (1944), —— Ariz. —— [144 P.2d 682].) In view of the harmony of judicial decisions on the point, it is unnecessary to discuss the matter further.

Turning now to the correlation of rule 7.1 with the present record, strikingly pertinent in both factual and legal features involved is the case of *North Whittier Heights Citrus Assn.* v. *National Labor Relations Board,* 109 F.2d 76, decided by the Circuit Court of Appeals, Ninth Circuit, in 1940. There the association was engaged in the business of receiving, handling, washing, grading, assembling, packing and ship-

ping the citrus fruits of its members and others for marketing. The proceeding was instituted by the Citrus Packing House Workers Union Local No. 21,091, charging the association with unfair practices under the National Labor Relations Act, commonly called the "Wagner Act." (29 U.S.C.A. § 151 et seq.) Following a hearing before the National Labor Relations Board, the association was ordered to desist from certain practices, and to do certain other things. The association petitioned the court to review the action of the board, and one of the questions raised was whether the employees in the packing house were "agricultural laborers" and as such exempt from the provisions of the act. In sustaining the board's jurisdiction over the association's employees by reason of the character of their work, the court points out distinguishing features in the consideration of *remedial statutes* in the industrial relationships of packing house services performed by employees of an individual grower upon his own products in his own physical plant and packing house and packing house services rendered by employees of an association or confederation of individual growers working in a packing house distant from the producing orchards and operated and conducted by an entity legally separate and distinct from the individual growers whose fruit such employees are processing and preparing in such packing houses for marketing. Thus, after noting in its opinion at page 79 that "the growers themselves have separated from the farm, the work now done in the packing house and with which we are here concerned, and have assigned it to an incorporated organization brought into being by the growers for such particular purpose," the court aptly observes at page 80:

"Industrial activity commonly means the treatment or processing of raw products in factories. When the product of the soil leaves the farmer, as such, and enters a factory for processing and marketing it has entered upon the status of 'industry'. In this status of this industry there would seem to be as much need for the remedial provisions of the Wagner Act, upon principle, as for any other industrial activity.

"Petitioner [the association] maintains that the nature of the work is the true test. Perhaps it would more nearly conform to the true test to say that the nature of the work *modified by the custom of doing it* determines whether the worker is or is not an agricultural laborer." (Italics ours.)

With reference to the transition that has taken place in activities incident to the preparation of farm products for marketing, the opinion in language peculiarly applicable to the factual situation here involved continues at page 80: "Petitioner argues that if each member of the non-profit cooperative corporation that runs the packing house were to personally hire and direct those doing his own packing and sorting, the work would be agricultural and his employees would be agricultural laborers; that it follows, therefore, that in the case of the same members acting under a single organization to accomplish the same result there can be no change in the nature of the work nor in the status of the persons doing it. The conclusion does not follow. *The factual change in the manner of accomplishing the same work is exactly what does change the status of those doing it.* The premise laid down by petitioner in this phase of its argument is not, however, the exact situation facing us. The packing house activity is much more than the mere treatment of the fruit. When it reaches the packing house it is then in the practical control of a great selling organization which accounts to the individual farmer under the terms of the statute law and its own by-laws." (Italics ours.)

In concluding this phase of the case the court quotes with approval at page 81 the following "apt language" in *Pinnacle Packing Co.* v. *State Unemployment Com.,* an unreported decision of the Circuit Court of Jackson County, Oregon, rendered in 1937: " 'The fruit growers who are engaged in the care, cultivation, picking, and delivery of the products of the orchard to be processed, graded, packed and marketed are engaged in agricultural labor and are exempt from the provisions of the statute. As soon as the fruit is delivered by the growers to the plaintiff for processing, grading, packing, and marketing, then the exemption ceases. The plaintiffs engaged in processing, grading, and packing and marketing the fruits are engaged in industry and are, therefore, subject to the provisions of the act and are not exempt as being engaged in agricultural labor.' "

The North Whittier case represents a realistic appraisal of modern development in business methods whereby many activities formerly embraced in farming operations or in intimate connection therewith have become specialized and removed from the farm, so that as the result of such evolution-

ary process the work may properly be regarded as industrial in nature rather than agricultural in the common conception of that term. Moreover, contrary to the defendant's claim, that case cannot be differentiated from the facts involved here as to service of nonmembers by the association. While *there* the cooperative's packing house facilities were *directly* available to "others" than members, *here* the defendant association's complete storage services are *indirectly* available to nonmembers—that is, "applicants for membership" or "temporary members" who, by paying the negligible application fee of $10 and without requirement to become fully paid-up ($300) members, are entitled to share in *all* the warehousing privileges. Such a tenuous line of demarcation between the two cases is in fact no distinction at all insofar as mode of operation is concerned. In addition, the defendant association under its state license as a bonded warehouse is prohibited from "making any discrimination between persons desiring to avail themselves of warehouse facilities." In the light of these observations the North Whittier case has particular significance here.

■ The defendant association is placed on no different plane from a legal standpoint because it is smaller in size than the large citrus fruit packing house involved in the North Whittier case. The important consideration is the *comparable record* here prevailing: (1) Divorced from the farm, the defendant as a *corporate entity* engages in one main business function—the acceptance, storage and releasing of rice and grain deposited in its warehouse, and the handling and sale of certain miscellaneous merchandise; (2) The defendant's employees are subject to its exclusive right of direction and control, stand in an employment relationship with it alone, and perform services customarily and usually performed by warehousemen in preparing commodities for shipment and disposition in the market; (3) Purporting to restrict its services to members, the defendant permits *others* upon the payment of a nominal application fee to use its storage and shipping facilities; (4) Purporting to be a nonprofit organization, the defendant "rebates" to members alone *all* storage fees collected in excess of operating expense—thus including the profitable overcharge from nonmembers using the warehouse; (5) The defendant issues negotiable warehouse receipts and operates under a license requiring that its storage facilities

be available without discrimination to anyone desiring to avail themselves thereof; and (6) General load-weighing service performed by the defendant for the public upon request. Upon this record the conclusion seems inescapable that the defendant association is in essence a commercial enterprise—a profitable *public warehouse business*.

While the North Whittier case was decided in the light of the statutory language alone, the rationale of that decision becomes even more persuasive when correlated with the administrative definition of the term "agricultural labor" embodied in rule 7.1, above quoted. Concededly, the services performed by the defendant's employees are *not* "on a farm" and so do not meet the specification of subdivision (1) of said rule. Equally exclusive is the plain language of subdivision (2), for it requires that services rendered "in connection with the drying, processing, packing, packaging, transportation, and marketing of materials which are produced on the farm" be "*incident to ordinary farming operations as distinguished from manufacturing or commercial operations*" and be "*performed by an employee of the owner or tenant of the farm.*" (Italics ours.) Thus, to come within the "agricultural labor" exemption, *off the farm* services must be an integral part of farming operations performed for the farmer as such—*not for a third person* separate and apart from such fundamental concept. Regardless of any argument as to the commercial nature of the defendant association's enterprise, it admittedly is not the owner, tenant or operator of any farm land. To overcome the barrier of the qualifying employment provision of said subdivision (2), the defendant argues that "the corporation, the association, is nothing more than an instrumentality of the owners and tenants of the farms," and "defendant's employees were in effect the employees of the landowners or tenants." Such observation is not only squarely at variance with the facts of this case—demonstrating that the defendant association in *all* its services functions as a unit *wholly independent* of the farmers comprising its membership—but is likewise contrary to the elementary legal principle that a corporation is a complete legal entity separate and apart from the individuals who own it. The nature of the defendant's corporate structure is immaterial for "cooperative corporations . . . are just as distinct an entity as are other private corpora-

tions.'' (Fletcher's Cyclopedia of Corporations (perm. ed.), vol. I, § 25, p. 90.) ▓ The doctrine of separate entity will be disregarded only to prevent fraud or grave injustice. (*Hollywood Cleaning etc. Co.* v. *Hollywood Laundry Service,* 217 Cal. 124 [17 P.2d 709].) Obviously no such reason exists here for ignoring the plain language of the effective administrative definition—but, on the contrary, to treat the defendant corporation nevertheless as the *alter ego* of its individual farmer members *would, in fact, promote injustice* by unnecessarily restricting the operative scope of the unemployment insurance law of this state, a limitation wholly out of line with the beneficent purpose of such legislation that, consistent with its terms, the coverage provisions have a broad application. (*California Employment Com.* v. *Black-Foxe Military Inst., supra.*)

In support of its contrary view on this phase of the case, the defendant cites *Industrial Commission* v. *United Fruit Growers Assn.* (1940), 106 Colo. 223 [103 P.2d 15], wherein the Colorado Supreme Court interpreted their somewhat similar state regulation as exempting employees of a cooperative marketing association from the operation of the Unemployment Compensation Act as being ''agricultural laborers.'' Regardless of the point of *factual distinction there prevailing* in that the association was a *nonprofit* cooperative association limiting its operations ''solely [to] marketing the fruit crops of its members,'' that case nevertheless stands alone in its disregard of the corporate entity of a cooperative even under those circumstances, and its rationale has been expressly rejected as unrealistic when the precise question has been raised in analogous situations before the courts of other states. (*Cowiche Growers, Inc.* v. *Bates* (1941), 10 Wn.2d 585 [117 P.2d 624]; *Employment Security Commission* v. *Arizona Citrus Growers* (1944), —— Ariz. —— [144 P.2d 682].) Moreover, it should be noted that these last-cited cases, though concerning *nonprofit* cooperatives performing marketing services for *members only,* make extensive reference to the North Whittier opinion and hold that the fundamental principles there determinative of the separate legal entity of the citrus fruit packing house serving members *and others,* apply with equal force to preclude cooperative associations organized for the exclusive benefit of their members, and not for profit, from claiming exemption on the ground here involved with respect to state unemployment insurance legislation. (See,

also, *In re Yakima Fruit Growers Assn.* (1944), 20 Wn.2d 202 [146 P.2d 800].) The authoritative discussion in these cases regarding the substantial point of corporate entity wholly accords with settled rules of law and cannot be successfully attacked.

Nor does section 1213 of the Agricultural Code, to which the defendant refers as lending *implied* support to its claim of exemption, have any bearing on the issue in controversy here. It expressly provides for the same treatment for an association as for its farmer members only as to those "exemptions under *any and all existing laws* applying to *agricultural products*"—for example, exemptions with reference to inspection (Agr. Code, § 307) and standards (Agr. Code, § 830). But such statutory language has no logical application to the question of whether an individual is engaged in agricultural labor as the problem is here presented. Moreover, the cooperative marketing statutes were enacted in 1923 and compiled in the Agricultural Code in 1933; the Unemployment Insurance Act (as now designated) was passed in 1935. (Stats. 1935, p. 1226.) By the terms of the latter act, as amended in 1937 (Stats. 1937, p. 2052), exactions are levied upon an "employer" (§ 38); an "employer" means "any employing unit" (§ 9(a)); and "an employing unit" means "any individual or *type of organization,* including any partnership, *association,* trust, . . ." (§ 9(e).) If despite this inclusive language, the Legislature nevertheless intended to exclude cooperative associations from the application of the act, it is but reasonable to assume that it would have so stated. Such specific exemption not having been declared in the *particular legislation* here involved, it should not be "engrafted . . . therein by judicial interpretation" in defeat of the law's beneficent purpose. The *later* expression of legislative intent should prevail. (*United Milk Producers* v. *Cecil,* 47 Cal.App. 2d 758 [118 P.2d 830].)

Courts as courts should not shut their eyes to what they know of the common affairs of business and industry. Farmer cooperative associations have become increasingly numerous as the result of changing economic conditions. Organized to secure definite financial advantages by performing certain functions at a smaller cost per unit than would be possible for the individual farmer acting in his own right, such associations are commendable in modern economy and to

be encouraged; but where they operate as distinct entities in activities such as warehousing, conducted separate and apart from farming operations and at a distance from them, such enterprises, while helpful, are "not an incident to ordinary farming operations as distinguished from . . . commercial operations" and should not be treated in a different manner from any other business concern insofar as bearing their share of the social responsibilities flowing from the state unemployment insurance law. ▉ The duties of the employees of the defendant association are in all respects identical with the duties of any commercial warehousemen; and the fact that such services are performed by individuals in the employ of a farmers' cooperative association is immaterial, for it is "the nature of the work modified by the custom of doing it" which determines whether it falls within the "agricultural" or "industrial" field. ▉ The defendant's employees are in need of the same insurance protection against the hazards of unemployment; and the practical reason motivating the exemption in question—not a paramount purpose to benefit and encourage agriculture as such, but the avoidance of administrative difficulties in ascertaining and collecting the tax, involving expense disproportionate to the resulting advantage—does not exist here where the defendant association maintains a central place of business easily accessible to the taxing authorities and is equipped to keep adequate employment records. Having in mind, then, these points— (1) the stated purpose of the California Unemployment Insurance Act and the administrative interpretation thereof embodied in rule 7.1, (2) the persuasive reasoning of the pertinent decisions following the well-considered opinion in the North Whittier case, analyzing the structure and functions of a farmers' cooperative association, and (3) the commercial aspect of the defendant's enterprise in relation to its features of profit-sharing and service to nonmembers as disclosed by the record—the conclusion seems inescapable that it was not the intent of the Legislature that the services here involved should be excluded from the operation of the act as constituting "agricultural labor." It therefore follows that the defendant association may not claim the exemption sought but is liable for "contributions" computed on the wages paid to its employees as provided by the statute.

The judgment is reversed, with directions to the trial court

to enter judgment against the defendant association in accordance with the plaintiff commission's claim under the provision of the California Unemployment Insurance Act.

Gibson, C. J., Shenk, J., Traynor, J., and Spence, J. pro tem., concurred.

CARTER, J.—I dissent. In this case the trial court found that the services performed by the employees of defendant were agricultural labor as that term is used in the California Unemployment Insurance Act. (Stats. 1935, p. 1226 as amended.) Hence, only the evidence favorable to defendant may be considered and all conflicts resolved in its favor. Therefore, I believe that at the outset the facts should be clearly stated.

Defendant is a cooperative association incorporated in 1914 under the laws providing for the organization of cooperative agricultural associations, *not created to make a profit for themselves or their members as such but only for their members as producers.* (Civ. Code, §§ 653m-653s, added by Stats. 1909, p. 16; now in Agr. Code, §§ 1192-1221.) Under the above cited provisions, *only* persons *who are producers* may form such a corporation (Agr. Code, § 1193), and may admit as members *only persons engaged in the production of products* "to be handled by or through the association, including the lessees and tenants of land used for the production of such products and any lessors and landlords who receive as rent all or part of the crop raised on the leased premises." (Agr. Code, § 1195.) Defendant *limited its membership to owners or tenants of a minimum quantity of land in Butte County, and all of its members are producers of agricultural products.* Its membership certificates are valued at $300 each, there being 48 outstanding at the time in question. There are 25 applicants for membership who have each paid $10 on account.

Defendant owns and operates a warehouse in which *it stores grain and rice for its members,* including the applicant members, *but not others,* except sometimes the assignees of members. Persons become assignees of members only by reason of a transfer to such persons by members of their right to the grain stored and such transfers are solely for the purpose of securing loans. The assignees do not become

members. *It does not process or sell rice, grain or other products.* At the beginning of the season it fixes a storage charge and makes rebates at the end thereof if the charge is more than the amount necessary to meet the cost of operation. No rebate is made to the applicant members unless they pay the balance due on their membership. Defendant purchased, usually *upon order of its members,* and sold *to its members,* merchandise *commonly used in farming but made no profit thereon.* It made a few sales of merchandise to one of its employees, not one of its members, but did not make or offer to make sales to others. It is licensed by the State Department of Agriculture to conduct a general warehouse business and authorized to issue negotiable warehouse receipts (Agr. Code, §§ 1231-1258), which are sometimes assigned by the members and the assignee pays the storage charges. *The storage rates have been fixed by defendant's directors but not by the Railroad Commission. It did not solicit business from nonmembers or permit the public to use the warehouse.* And although licensed under the warehouse act defendant does not purport to operate a public warehouse.

With the foregoing factual background we turn to the statute.

The Unemployment Insurance Act was adopted in 1935. It provides for the payment of contributions to alleviate conditions of unemployment in industry generally, but exceptions from its operation are provided for therein. Section 7(a) reads in part: "The term 'employment' does not include: (a) Agricultural labor; . . ." No definition of that term is given in the act. Plaintiff, California Unemployment Commission is created by the act (§ 75), and to it is entrusted the enforcement of the act. It is authorized, and it is its duty, to "adopt and enforce rules and regulations which to it seem necessary and suitable to carry out the provisions of this Act." (§ 90(a).) Its first rule, and an amplification thereof defining the term "agricultural labor," were effective in 1935. It generally embraced anyone engaged in the art or service of cultivating the ground, the harvesting, or the packing and preparation for market of products where the commodity does not change its original state. The amplification dealt with horticultural products. A rule effective in January, 1936, also exempted from the operation of the act services performed in the packing and preparation for

market by growers and nonprofit cooperative marketing associations, where the commodity did not change its original state, and such services were performed exclusively for members and no profit was made.

There is a clear indication in those rules that it was intended that the term ''agricultural labor'' should embrace more than employment in the mere cultivation and harvesting of products. Packing and preparation for market were also included when done by a nonprofit association, which may imply that services rendered in connection therewith need not be performed upon the land where the commodities were produced or for the actual producer. In the instant case the storage was an incident of the harvesting, packing and preparation of the products for market. The rule (rule 7.1) effective on February 14, 1937, which was in force during the time here involved, is quoted in the majority opinion. The rule adopted in April, 1940, added nothing material to the above quoted rule 7.1, insofar as the facts in the instant case are concerned. The Legislature evinced its approval of those rules by its action and inaction after their adoption. During the first session of the Legislature following the adoption of the act (1937), rule 7.1 became effective. At that session section 7 of the act was twice amended (Stats. 1937, pp. 2052, 2057), but the term ''agricultural labor'' remained the same as it had theretofore existed without amplification. Likewise, in 1939, section 7 was amended but no definition of what constituted agricultural labor was given. (Stats. 1939, ch. 628, p. 2048; ch. 1039, p. 2850.) At the 1939 session section 90(b) of the act dealing with the authority of the commission to adopt rules and regulations was amended by adding thereto the sentence: ''Rules or regulations heretofore adopted shall continue in effect until amended or rescinded in accordance with the procedure prescribed by this section.'' (Stats. 1939, ch. 1083.) Also during the 1939 session of the Legislature, amendments to the Federal Social Security Act dealing with unemployment insurance were being considered and such amendments were adopted by Congress on August 10, 1939; they defined agricultural labor in detail and broadly, the term having theretofore been undefined by Congress. It read in part: ''The term 'agricultural labor' includes all service performed—(1) On a farm, in the employ of any

person, in connection with cultivating the soil, or in connection with raising or harvesting any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training, and management of livestock, bees, poultry, and fur-bearing animals and wild life. . . .

"(4) *In handling, planting, drying, packing, packaging, processing, freezing, grading, storing, or delivering to storage or to market or to a carrier for transportation to market, any agricultural or horticultural commodity;* but only if such service is performed as an incident to ordinary farming operations or, in the case of fruits and vegetables, as an incident to the preparation of such fruits or vegetables for market. The provisions of this paragraph shall not be deemed to be applicable with respect to service performed in connection with commercial canning or commercial freezing or in connection with any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption." (26 U.S.C.A. § 1607.) A bill introduced in the Legislature providing for the adoption of the federal definition of the term, whatever it might be did not pass. However, the 1939 amendment to section 7 of the California Unemployment Insurance Act did add many of the other amendments made by Congress in 1939. At the extra session of the Legislature in 1940, a resolution directing the commission to adopt the definition given to the term by Congress in 1939 did not pass. In 1941, the Legislature again amended several sections of the act but did not amend section 7. A bill was introduced to amend section 7 so as to define the term practically the same as was done by Congress in 1939, but on recommendation of the committee to which it was assigned, the amendment was stricken. In 1943, the Legislature passed a bill amending section 7, giving the definition of the term used by Congress in the 1939 federal statute; it was vetoed by the Governor.

It should also be noted that the act was adopted in California in the light of contemplated conformity to the federal act. Because of the interrelation of the acts, the obligations imposed by them, and the necessity for the adoption of an approved state act in order that benefits under the federal act may be enjoyed, there is a strong justification for the policy that they operate uniformly and harmoniously. (See *Industrial Commission* v. *Woodlawn Cemetery Assn.,* 232

Wis. 527 [287 N.W. 750]; *Woods Bros. Const. Co.* v. *Iowa
U. Compensation Com.,* 229 Iowa 1171 [296 N.W. 345];
*Matcovich* v. *Anglim,* 134 F.2d 834; *Buckstaff Bath House
Co.* v. *McKinley,* 308 U.S. 358 [60 S.Ct. 279, 84 L.Ed. 322].)
That policy is evinced by the state act. Section 2 provides
in part: ''This act is enacted as a part of a National plan
of unemployment reserves and social security, and for the
purpose of assisting in the stabilization of unemployment con-
ditions. The imposition of the tax herein imposed upon Cal-
ifornia industry alone, without a corresponding tax be im-
posed upon all industry in the United States, would, by the
corresponding penalty upon California industry, defeat the
very purposes of this act set forth in section 1. Therefore
this act shall take effect only if and when there is enacted
legislation by the United States Government providing for
a tax upon the payment of wages by employers in this State,
against which all or any part of the contributions required
by this act may be credited.'' Hence, heed must be given
to the federal act as interpreted by the rules adopted there-
under and also by the latest amendments thereto which de-
fine agricultural labor to clearly embrace the activities in-
volved in the instant case. The federal cases have recognized
that the services need not be performed by employees of the
farmer. *Stuart* v. *Kleck,* 129 F.2d 400, and *Chester C. Fos-
gate Co.* v. *United States,* 125 F.2d 775, follow the federal
definition. They held that in its orthodox sense the serv-
ices performed where a corporation supplied labor to culti-
vate the soil and do other things on the land for the owners
thereof, constituted agricultural labor within paragraph (a)
of the treasury regulation, and that the second sentence in
paragraph (b) was not intended to qualify paragraph (a).
Indeed, they applied the regulation. In line with those cases
(see, also, *California Employment Com.* v. *Bowden,* 52 Cal.
App.2d Supp. 841 [126 P.2d 972]) under the first para-
graph of the rule the services may be agricultural labor where
the employees are not employed by the owner or tenant of
a farm when, however, the services performed are of the char-
acter which are clearly acts of farming. When it comes to
packing, processing, transporting and storing in a warehouse
off the farm we find activities which are in many respects a
part of farming operations.

Applying rule 7.1 to the facts in the instant case, it clearly

appears that the services performed by defendant's employees constituted agricultural labor as therein defined. True, the employees were not engaged by the farmers or tenants in person, but as above shown that was not necessary and the activities engaged in by defendant were concerned either with storage of the products of farms owned or operated by its members, or the procurement and handling of merchandise used by its members in farming operations. The corporation, the association, is nothing more than an instrumentality of the owners and tenants of the farms. None but owners or tenants are accepted as members. The corporation is nonprofit and operates for its members thus indicating its noncommercial character and that it is only an instrumentality of the members. This view finds support by implication in the law under which defendant is organized. Section 1213 of the Agricultural Code provides: ".... Any exemptions under any and all existing laws applying to agricultural products in the possession or under the control of the individual producer, shall apply similarly and completely to such products delivered by its farmer members, in the possession or under the control of the association." That clause embodies *a broad statement of policy that the association and its members may be treated as one in connection with exemptions in the laws although it refers only to products.* That is a policy which has been declared by the Legislature and was on the books when the act in question was adopted. The two must be read together and in so doing the only reasonable conclusion is that there was no intent to treat farmer exception provisions as applying only to instances where the farmers were not banded together in associations. In the case at bar it must be remembered that the trial court found for defendant and the evidence must be interpreted in a light most favorable to it. Only one instance is shown where a nonmember was supplied merchandise. The trial court may have disregarded that. Storage facilities were supplied *only to members.* The fact that defendant has a license to operate its warehouse and thus has assumed the duty to serve the public was not deemed controlling by the trial court. More vital is the actual manner in which defendant operates. The services performed are of the character that is common in conducting a farm, and a necessary part thereof, that is, handling and storage of the crops produced and handling

and procuring equipment. *If a farmer stores his products on his property it would not be doubted that such was a part of his agricultural pursuit.* It is not required that such storage be made on his farm. If he or his neighbors form a group to perform the same functions off the farms they are still engaged in agriculture. If it be said that paragraph (1) of rule 7.1 does not embrace the activity here involved because it is not performed on the farm, and that likewise paragraph (2) does not include the activities here involved, then we have an activity which is clearly agricultural in character but which is neither embraced in nor excluded by the rule. However, we believe the storage of materials produced on a farm is included within paragraph (2), and, as we have seen, defendant's employees were in effect the employees of the landowners or tenants, and that the procurement of equipment for use on a farm is a farming activity. There is no commercial aspect to defendant's activity considering the manner in which it is conducted. In arriving at this conclusion I am not disregarding the corporate entity of defendant as that phrase is commonly understood but are merely arriving at a definition of agricultural labor.

The foregoing reasoning is ably supported in the case of *Industrial Commission* v. *United Fruit Growers Assn.*, 106 Colo. 223 [103 P.2d 15, 17], where the court said: "Also it is conceded that if an individual farmer member of the association marketed the fruit produced from his orchard, the labor attendant to such marketing operation would enjoy an exempt status under both regulation 6 and statute. The commission contends, however, that a transition from an exempt to a nonexempt position occurs when the association takes over the marketing function, and the labor incident thereto is performed by *its* employees, and not the *farmers*. We cannot agree with this contention. If the labor employed by one individual grower in marketing his crop is within the exception of the statute, as unquestionably is the case, it would seem that if two or more farmers pool their crops and cooperate in marketing them, their situation would not be different from that of the individual grower. It is a matter of common knowledge that all fruit growers do not belong to cooperative associations and that such producers individually, with labor employed by them, attend to their own marketing operations. Thus we can perceive no reason for hold-

ing that because a number of fruit farmers cause a cooperative association to be organized for the purpose of facilitating the marketing of their farm products, they should be subject to the terms of a regulatory statute which concededly would not apply to the labor employed by them if acting individually, or by other persons engaged in the same activity who are not members of such an association. . . . The basic conception of an agricultural cooperative association is that of a group of farmers who reside in the same vicinity acting together for their mutual benefit in the cultivating, harvesting and marketing of their agricultural products, and the association itself, with the special powers and limitations conferred by statute, is merely a convenient instrumentality in the hands of the farmers for carrying on such activities. As is stated in *United States* v. *Rock Royal Co-op.*, 307 U.S. 533, 59 S.Ct. 993, 1008, 83 L.Ed. 1446: 'These agricultural cooperatives are the means by which farmers and stockmen enter into the processing and distribution of their crops and livestock.' In *Mountain States Assn.* v. *Monroe*, 84 Colo. 300, 269 P. 886, we held that the relation between a cooperative marketing association and its members is that existing between a trustee and his beneficiary or a principal and his agent. Under our cooperative marketing law, such associations are given the power 'to act as the agent or representative of any member or members in any of the above-mentioned activities' (c. 106, sec. 19(c), '35 C.S.A.), which includes 'marketing' (c. 106, sec. 17, '35 C.S.A.). Section 35 of the Cooperative Marketing Act provides: 'Any provisions of law which are in conflict with this article shall be construed as not applying to the associations herein provided for. Any exemptions whatsoever under any and all existing laws applying to agricultural products in the possession or under the control of the individual producer, shall apply similarly and completely to such products delivered by its members, in the possession or under the control of the association.' Accordingly, because of the peculiar relationship between the cooperative association and its members, it would seem evident that such of the purely agricultural activities of the producer members as are incidental to his ordinary farming operations remain so whether they are performed by him on his farm or for him through the medium of his cooperative marketing association.''

The cases of *Great Western Mushroom Co.* v. *Industrial Commission,* 103 Colo. 39 [82 P.2d 751]; *H. Duys & Co., Inc.* v. *Tone,* 125 Conn. 300 [5 A.2d 23]; *Park Floral Co.* v. *Industrial Commission,* 104 Colo. 350 [91 P.2d 492]; *Christgau* v. *Woodlawn Cemetery Assn.,* 208 Minn. 263 [293 N.W. 619]; *Unemployment Comp. Div. etc.* v. *Valker's Greenhouses,* 70 N.D. 515 [296 N.W. 143]; and *Oak Woods Cemetery Assn.* v. *Murphy,* 383 Ill. 301 [50 N.E.2d 582], relied upon in the majority opinion were concerned chiefly with the question of *industrial as distinguished from farming activity* or that the labor be performed on the farm. Those matters have heretofore been discussed. (See *St. Louis Rose Co.* v. *Unemployment Comp. Commission,* 348 Mo. 1153 [159 S.W.2d 249].) The latter factor is not required by the rule.

These views are not contrary to those expressed in *Cowiche Growers, Inc.* v. *Bates,* 10 Wn.2d 585 [117 P.2d 624]. There, although reliance was placed upon *North Whittier Heights Citrus Assn.* v. *National Labor Relations Board,* 109 F.2d 76, the *state statute required that the services be performed on the farm for the owner or tenant.* (Also see *Appeal of Wenatchee Beebe Orchard Co.,* 16 Wn.2d 259 [133 P.2d 283].)

Much reliance is placed by the majority opinion on *North Whittier Heights C. Assn.* v. *National L. R. Board, supra.* That case is clearly distinguishable from the case at bar. First, the association there was engaged *in more than merely storing products grown by its members* and an incidental sale of farm equipment to its members as is true in the case at bar. It was engaged in "receiving, handling, washing, grading, assembling, packing and shipping the citrus fruit of its members *and others* for marketing under a marketing contract with the Semi-Tropic Fruit Exchange, which has a marketing agreement with the California Fruit Growers Exchange. Through these agencies practically all of the fruit handled by Petitioner moves directly from its plant to vehicles for transportation under the direction of the California Fruit Growers Exchange into interstate and foreign commerce." The point is stressed by the court that it was a *big commercial enterprise* a condition certainly not present in the instant case. The court said at page 79:

"The production and marketing of citrus fruits in California have *undergone changes as have various other activities in their transition from 'one man' affairs to 'big business'.*

The public regard for the product itself has changed from that of a pretty and tasty tidbit to that of a standard widely used fruit food. Large acreages, in fact large sections of the State of California, are devoted almost wholly to this horticultural product. In the early days everything connected with the product was done 'on the farm'. Experience produced better fruit, better fruit created greater demand, greater demand impelled system in handling. *Possibly the most marked change in this transition was that of systematic marketing and uniformity in preparation for marketing, and these changes brought about the desirability of separating certain processes from the service of the 'farmer' to specialists.* The farmer also learned through bitter experience that individual grove product sale to middlemen or through consignment to independent fruit marketers resulted too often in ruin. The *vast and comprehensive system* which has been hereinbefore briefly alluded to was built up to adequately handle this large industry and to eliminate the practices which were so costly to the growers. Thus the growers themselves have separated from the farm, the work now done in the packing house and with which we are here concerned, and have assigned it to an incorporated organization brought into being by the growers for such particular purpose." (Italics added.) And at page 80:

"When every detail of farming from plowing to delivering the produce to the consumer was done by the farmer and his 'hired man', this common denominator was present. But when in the transition of citrus fruit growing from this independent action to the *great industry of the present* in which the fruit is passed from the individual grower through contract to a corporation for treatment in a packing house owned and run by such corporation, to be delivered by this corporation to an allied corporation for transportation and market, we think the common denominator has ceased to exist." (Italics added.) And at page 80:

"Industrial activity commonly means the treatment or processing of raw products in factories. When the product of the soil leaves the farmer, as such, and *enters a factory for processing and marketing* it has entered upon the status of 'industry'." (Italics added.) Second, contrary to the case at bar it held itself out to the public as serving and did serve all comers not merely members. That is indicated from the

foregoing quotation. Third, there was involved much more than mere storage. The court said at page 80:

"The premise laid down by petitioner in this phase of its argument is not, however, the exact situation facing us. The *packing house activity is much more than the mere treatment of the fruit.* When it reaches the packing house it is then in the practical control of a great selling organization which accounts to the individual farmer under the terms of the statute law and its own by-laws." (Italics added.) Fourth, the *same court in the later case of Stuart* v. *Kleck, 129 F.2d 400, held that where a corporation furnished agricultural services to be rendered to farmers on a farm, the labor was agricultural even though the employees were not hired by the farmer.* In that case they were concerned with the Federal Social Security Act as distinguished from the National Labor Relations Act, involved in the Whittier Heights case. The court said in the Stuart case at page 402:

"When the Congress, in providing for an exemption from the provisions of the Act, made use of the broad term 'agricultural labor', this expression, used by itself, *must be given a meaning wide enough to include agricultural labor of any kind,* as generally understood throughout the United States. . . .

"In the recent case of *Chester C. Fosgate Co.* v. *United States,* 5 Cir., 125 F.2d 775, it was held that services rendered by a company in cultivating crops of citrus fruit under contracts with crop owners were 'agricultural labor' rendered in connection with the cultivation of the soil, even though crop owners did not directly hire laborers but dealt with the company, which in turn put laborers to work, and the company was entitled to recover back social security taxes assessed with reference to wages paid to those laborers." (Italics added.) Moreover, the majority opinion here stresses the point (indeed the whole basis of the opinion rests on that point) stated in the Whittier Heights case that: *"The factual change in the manner of accomplishing the same work is exactly what does change the status of those doing it."* That theory was later *wholly repudiated by the same court in the Stuart case.* The court there said at page 402:

"Accordingly, the exemption attaches to the 'services performed', which refers to the *type of work that is being done, and is not dependent on the form of the contract or whether*

*the employee is employed by the owner or tenant of the farm or an independent contractor. . . . The important question, then, is: What is the nature of the services furnished and were these performed upon a farm?''* (Italics added.) Fifth, and this goes to the heart of the whole matter, all of the above factors indicate *that the activity was so altered from ordinary farming operations that it became an industry.* But in the case at bar those conditions do not exist. There is no answer in the Whittier Heights case or in the majority opinion in the case at bar to the simple proposition that where farmers in a confined area (Butte County here) associate themselves for the sole purpose of maintaining a storage house near their farms for storing their products they are in no different position than if each of the members maintained such a house on his land, or on the land of one of the members. To say otherwise is to ignore the realities of the situation.

The majority opinion states that in the Whittier Heights case ''the cooperative's packing-house facilities were *directly* available to 'others' than members, *here* the defendant association's complete storage services are *indirectly* available to non-members—that is, 'applicants for membership' or 'temporary members' who, by paying the negligible application fee of \$10 and without requirement to become fully paid-up (\$300) members, are entitled to share in *all* the warehousing privileges. Such a tenuous line of demarcation between the two cases is in fact no distinction at all insofar as mode of operation is concerned.'' *That statement is not borne out by the record.* The applicant members must have the same qualifications as the regular members and must be farmers in the area. That is quite different from a business holding itself out to the public generally.

The case really simmers down to the proposition as to whether farmers can do collectively through a nonprofit association in the legal form of a corporate entity that which they could do individually or in small groups on their individual farms without incurring liability for the unemployment insurance tax. It is conceded that the work which the employees perform for defendant is the same work which they would perform for the individual farmers if they had similar storage facilities on their farms, and that such work would be classified as farm labor under the definition of that term pro-

mulgated by the Unemployment Insurance Commission. This, to my mind, is the controlling factor in this case.

From what I have said in the foregoing dissenting opinion it is obvious that the judgment should be affirmed.

Edmonds, J., concurred.

Respondent's petition for a rehearing was denied January 25, 1945. Edmonds, J., and Carter, J., voted for a rehearing. Schauer, J., did not participate therein.